UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

LINDA METCALF,

MICHELLE HARTLY,

FILMWEST PRODUCTIONS, LLC,

SUNWEST CAPITAL
MANAGEMENT, INC. (d/b/a Spirit
Halloween), and

DO YOU KNOW WHERE YOUR
PARENTS ARE, LLC

                          Plaintiffs,

          v.

MERRILL LYNCH, PIERCE,
FENNER & SMITH, INC.,

LAWRENCE R. BELLMORE, JR.,

ROBIN BRUBACHER,

SOLAR WIND PRODUCTIONS, LLC,

MICHAEL JACOBS,

RUBY HANDLER-JACOBS, and

RIO GRANDE STUDIOS, LLC

                          Defendants.

No. 4:11-cv-127
Honorable John E. Jones, III

JURY TRIAL DEMANDED

AMENDED COMPLAINT

Introduction

1.    The claims and damages alleged in this Complaint arise from the wrongful

conduct of an ongoing interstate racketeering enterprise which funds its operations by

fraudulently inducing the producers and investors in independent films to deposit funds

with Defendants nominally for use in financing and producing those films but actually

used to fund the racketeering enterprise's operations.

## PARTIES AND JURISDICTION

2.    Plaintiff Linda Metcalf is an adult individual residing in California. Metcalf is the Vice President of plaintiff SunWest Capital Management, Inc. ("SunWest, Inc."), a corporation registered in Nevada with its principal place of business in California. Metcalf is an investor in the "Do You Know Where Your Parents Are?" film project.

3.    Plaintiff Michelle Hartly is an adult individual residing in California who produces feature-length films for national and international distribution. She is the managing member of plaintiff FilmWest Productions LLC ("FilmWest LLC"), a limited liability company registered in California with its principal place of business in California. Hartly is also the managing member of Do You Know Where Your Parents Are? LLC ("Parents LLC"), a limited liability company registered in California with its principal place of business in California, established for the special purpose of producing a feature-length film tentatively titled "Do You Know Where Your Parents Are?"

4.    Defendant Merrill Lynch, Pierce, Fenner & Smith, Inc. ("Merrill Lynch") is a Delaware corporation with systematic and continuous contacts with the Commonwealth of Pennsylvania, including an office in Allentown, Pennsylvania, which at all relevant times supervised, controlled and approved all activity relating to the accounts at issue.

5.    Defendant Lawrence R. Bellmore, Jr. is an adult individual residing in Pennsylvania and former Financial Advisor at Merrill Lynch.

6.    Defendant Robin Brubacher is an adult individual residing in Pennsylvania and was at all relevant times a Vice President of Merrill Lynch in Allentown, Pennsylvania.

2

7.     Defendants Michael Jacobs and Ruby Handler-Jacobs are adult individual residents of New Mexico. Jacobs and Jacobs-Handler are members in Solar Wind Productions, LLC ("Solar Wind LLC"), a New Mexico corporation with its principal place of business in New Mexico. Solar Wind LLC, Jacobs and Jacobs-Handler voluntarily established in Williamsport and Allentown, Pennsylvania the bank accounts which are at issue in this action and voluntarily and specifically directed Plaintiffs to engage in substantial contacts with Merrill Lynch, Bellmore, and Brubacher in Pennsylvania for the purpose of depositing funds into a Pennsylvania bank account, which Plaintiffs did at the specific request of Defendants Solar Wind LLC, Jacobs, Jacobs-Handler, Merrill Lynch and Bellmore.

8.     Rio Grande Studios LLC, is a New Mexico corporation with its principal place of business in New Mexico. Jacobs and Jacobs-Handler are the members and owners of Rio Grande Studios. Rio Grande Studios, through its agents, voluntarily converted and misappropriated funds from the Pennsylvania bank account at issue in this action.

9.     This Court has jurisdiction under 28 U.S.C. § 1331 because this lawsuit raises questions of federal law, and under 28 U.S.C. § 1332 because the parties are diverse. Venue is appropriate in the Eastern District of Pennsylvania under 18 U.S.C. § 1965 because all Defendants are found, have an agent, or transact business therein, and under 28 U.S.C. § 1391(a)(2) because a substantial part of the events or omissions giving rise to the claim occurred therein.

## Facts Giving Rise To Liability

### A.     The Genesis Of The Feature Film

10.     In 2007, Metcalf, a writer, and Ms. Hartly, a film producer, began discussing the production of a feature length film based upon Metcalf's script, tentatively titled "Do You Know Where Your Parents Are?"

11.     In October 2008, FilmWest LLC and Metcalf signed a term sheet to produce the film. In support thereof, Metcalf transferred $200,000 to an account controlled by FilmWest LLC, and steps were taken to establish Parents LLC, which was recorded by the California Secretary of State in January 2009.

### B.     The Fraudulent Solicitation of Plaintiffs By Defendants

12.     On January 28, 2009, Jacobs and Jacobs-Handler, on behalf of Solar Wind LLC, solicited Hartly, Metcalf, FilmWest LLC and Parents LLC to enter into a joint venture with "Solar Wind Productions Film Fund presented by Rio Grande Studios," a complicated film financing enterprise.

13.     Jacobs and Handler-Jacobs represented, on behalf of Solar Wind LLC and Rio Grande Studios:

    (a)     That Solar Wind LLC had a leading in-house Chief Financial Officer named John Galen Davis who controlled millions of dollars in assets that Solar Wind LLC could leverage in its "proprietary" investment program to enable Solar Wind LLC to provide the necessary funding to FilmWest within ninety (90) days after the parties entered into an agreement for such funding.

    (b)     That the Solar Wind LLC funding program required FilmWest make a deposit of ten percent (10%) of the funds sought for the Picture as part of its application for the financing, and that such deposit would be placed into a "Film Fund Holding Account" and used to purchase an interest-bearing certificate of deposit which FilmWest or its designee would be an owner and signatory. Solar Wind LLC further assured that such deposit would be returned to FilmWest no later than at the end of the aforesaid 90-day period during which time

Solar Wind LLC would exercise its best efforts to provide funding for the Picture.

(c)      That Merrill Lynch was affiliated with Solar Wind LLC in connection with its financing program, was managing the film fund within Merrill Lynch, and would protect the deposit, that a senior Financial Advisor at Merrill Lynch, Lawrence Bellmore, had been designated by Merrill Lynch to specifically handle the film financing program, including to hold and protect the certificate of deposit (the "CD"), and that the deposit and the CD would be absolutely safe at all times and that, initially, "Linda Metcalf is the only signature on the account and will be in control of the funds."

14.      As described by the solicitation materials sent by Jacobs, Jacobs-Handler, and Bellmore, a copy of which is attached as Exhibit A,

1.      The Producer/Investor deposits the Development Deposit, 10% of the Adjusted Film Budget, into a Film Fund Holding Account established at the Selected Brokerage Firm.

2.      The Producer/Investor is listed as a co-signatory on the holding account.

3.      Upon the receipt, by the brokerage firm, the 10% Development Deposit is converted to a Certificate of Deposit or similar instrument (CD) for no less than a 3 month term.

4.      The Producer/Investor is listed as a co-signatory on the CD.

5.      A Secured Working Capital Line of Credit is obtained against the CD as collateral.

6.      The Working Capital Line of Credit is applied to obtain total film financing.

7.      Draw down of funds to follow the schedule as approved by the Parties.

8.      In the unlikely event that funding is not delivered within the estimated or reasonable time frame, the CD (Producer's Development Deposit) is returned to the Investor/Depositor.

As also described by the solicitation materials, the "length of time for deposit return" was "estimated to be a 60-90 day return."

15.     The solicitation materials included materials prepared by Merrill Lynch, bearing Merrill Lynch's insignia and trademarks, including "VIA and WCMA Account Applications" as well as "instructions for Solar Wind Productions, LLC clients who are not also clients of Merrill Lynch," which included detailed descriptions of how Merrill Lynch, through Bellmore, was to be involved in the film financing, including responsibility for providing "wiring instructions" and a role in making "final determination" with regard to certain financing options. The "instructions" further said that "any questions regarding … the Merrill accounts and the development deposit process should be directed to LR Bellmore, Jr. at 866-277-7229 / 570-327-6668."

16.     Bellmore, Brubacher and Merrill Lynch were aware Mr. and Mrs. Jacobs, Solar Wind LLC, and Rio Grande Studios were using these documents to solicit investors.

17.     On March 9, 2009, Robert Chanpong, a Vice President with a Merrill Lynch office in Pasadena, California, complained through Merrill Lynch's Office of General Counsel ("OGC") that he was "very concerned" one of his clients in California had been solicited by the same materials, which he suspected to be part of a "fraud." The OGC forwarded the complaint to, and discussed the complaint with, Merrill Lynch's Allentown office. In response, Alvin Walton, the Administrative Manager at Merrill Lynch in Allentown, informed Bellmore on March 13, 2009 that the Solar Wind Defendants could not use Merrill Lynch's documents for any solicitations. Brubacher was similarly informed of the misuse of Merrill Lynch materials. Yet, no Merrill Lynch employee contacted Plaintiffs at that time to correct the misrepresentations.

18.     On the same day that Bellmore was informed that the Solar Wind Defendants were not allowed to use the Merrill Lynch documents to solicit investors, a conference call was arranged and hosted by Bellmore using Merrill Lynch's conferencing system. During the call, Hartly (on behalf of FilmWest, Parents LLC, and Metcalf), Jacobs and Jacobs-Handler (on behalf of Solar Wind LLC and Rio Grande), and Bellmore (on behalf of Merrill Lynch) discussed the structure and function of the film financing fund, as well as the process for completing the development deposit. During the conference, Bellmore affirmed and adopted the Jacobs' representation that the fund was "inside" of and administered by Merrill Lynch.

19.     On March 13, 2009, Hartly, on behalf of all Plaintiffs, contacted Brubacher at Merrill Lynch's office in Allentown, Pennsylvania (a) to verify Bellmore's employment status with Merrill Lynch and (b) to verify the Defendants' representations that the "Solar Wind Productions Film Fund" was in fact "inside" Merrill Lynch and managed by Merrill Lynch. In response, Brubacher (a) verified Bellmore's employment status with Merrill Lynch, (b) verified the "Solar Wind Productions Film Fund" was in fact "inside" Merrill Lynch and managed by Merrill Lynch, and (c) stated that the Solar Wind project was "the first time" Merrill Lynch set up this kind of funding. Since it was "the first time" such financing was set up, Hartly asked if the funds were secured or insured. Brubacher represented that the funds were secured and insured according to national institutional standards.

20.     As revealed by Merrill Lynch's own documents produced after litigation was filed by the Plaintiffs, Brubacher was intimately involved in the management of the Solar Wind LLC accounts. For example, Brubacher was notified about, and was required to approve, each wire transaction to or from the accounts.

21.     Though Bellmore, Brubacher, and Walton were all aware that the Solar Wind Defendants had wrongly used the Merrill Lynch documents to solicit investors, neither Bellmore, Brubacher, nor Walton informed the Plaintiffs of this material fact until well after their deposit.

## C.     The Defendants' Instructions For The Development Deposit

22.     On March 16, 2009, Bellmore emailed Hartly, Metcalf, Jacobs and Handler-Jacobs the following:

> The contract calls for wiring funds to the Solar Wind Account and having 2 signatures on the account for the protection of the producer.
>
> That cannot be accomplished as it then gives Linda authority over other client accounts and assets beyond the CD in the Solar Wind account and other sub accounts.
>
> Therefore, I setup the sub account for wiring funds directly to it.
>
> For the moment, Linda Metcalf is the only signature on the account and will be in control of the funds. Once the account is established we can add the CFO as the other signature on the sub-account and require two signatures from that point out.
>
> If you have any questions as to the structure and how it works, call me.

23.     On March 24, 2009, Bellmore and Merrill Lynch received by registered mail the due diligence and signatory card for Metcalf to open the Parents LLC's subaccount off of the main Solar Wind LLC account, pursuant to Bellmore's specific and detailed instructions.

24.     On March 27, 2009, Jacobs called Hartly and threatened that, if the money was not deposited by March 30, he, Jacobs-Handler and Solar Wind LLC would sue Plaintiffs and not fund the film.

25.    On March 30, 2009, Merrill Lynch hosted another conference call with Bellmore, Jacobs, Jacobs-Handler, Hartly and Metcalf, wherein the specifics of the deposit were again discussed, with Bellmore again providing specific instruction to the Plaintiffs regarding the deposit.

26.    Per Bellmore's instruction, on March 30, 2009, Parents LCC wired Metcalf's $200,000 to a SunWest Capital Management Bank of America account.

27.    On April 1, 2009, again pursuant to Bellmore's specific instruction, Metcalf's husband, Roger Metcalf, purchased a cashier's check for $200,000 payable to Solar Wind LLC, which he deposited into Solar Wind LLC's account number 888-07D12, for immediate transfer to the Parents LLC subaccount, as described by Bellmore, for conversion into a 90 day CD which would be used to fund a line of credit for the feature film, as represented by Bellmore, Merrill Lynch, Jacobs, Jacobs-Handler, Solar Wind LLC, and Rio Grande Studios.

28.    The $200,000 was not transferred to the Parents LLC account nor was it converted into a 90 day CD. Instead, as described below, Bellmore, Brubacher and Merrill Lynch — despite having before April 1, 2009 actual and constructive knowledge the account was being used for fraudulent purposes, that Plaintiffs' funds would be comingled with other investors' funds, and that other investors believed their funds were being mishandled and misappropriated — conspired with the Solar Wind Defendants to convert Plaintiffs' deposit to assist the Solar Wind Defendants in paying off more than $150,000 that Merrill Lynch had loaned to the Solar Wind Defendants.

**D.    Defendants' Pre-Existing Racketeering Enterprise**

29.    Unbeknownst to any Plaintiffs, but known to all Defendants, the Defendants deliberately left the funds in Solar Wind LLC's primary account so that Solar

Wind LLC could wrongfully convert funds from the account to meet their own expenses, to pay off their debts to Merrill Lynch, and to fund fraudulent schemes against others, rather than use the funds as collateral for credit lines for use in obtaining financing for Plaintiffs' film.

30.  Unbeknownst to any of the Plaintiffs, but known to all of the Defendants, by April 1, 2009, the Defendants had already established a wrongful and illegal practice of mail and wire fraud by which investors and producers were induced, as Plaintiffs were, into making deposits into Solar Wind LLC's account upon the erroneous belief (created by Bellmore and Merrill Lynch) that the funds would be immediately moved to a subaccount, which the investors and producers controlled, for conversion into a CD.

31.  Unbeknownst to any of the Plaintiffs , on April 1, 2009, as Metcalf was depositing her funds, counsel for the producer ("Trojan Productions") of a completely separate film sent an email to Merrill Lynch demanding Merrill Lynch return that investor's funds, which had been deposited into the same Solar Wind LLC primary account in December 2008 based upon virtually identical misrepresentations by Bellmore, Merrill Lynch, Jacobs, Jacobs-Hndler, Solar Wind LLC, and Rio Grande Studios about the nature of the film fund.

32.  In response to the aforementioned April 1, 2009, demand by Trojan Productions, Bellmore wrote Brubacher: "**the feared has begun**."

33.  Before April 1, 2009, Bellmore, Brubacher and Merrill Lynch knew that the Solar Wind Accounts were being used for wire fraud and mail fraud. Before April 1, 2009, Bellmore, Brubacher and Merrill Lynch "feared" that the fraud — and Bellmore, Brubacher's and Merrill Lynch's malfeasance — would be discovered.

**E.     Defendants' Fraud Upon Other Investors Prior To Plaintiffs' Deposit**

34.    As Plaintiffs later learned, but as all Defendants knew before April 1, 2009, the 888-07D12 account into which Plaintiffs were instructed to deposit their funds was set up in December 2008 in Solar Wind LLC's name to receive and to manage deposits for other film projects, including a project operated by Trojan Productions and a project operated by RARA, LLC.

35.    At or about the same time account 888-07D12 was established, Merrill Lynch set up a Loan Management Account 888-07D13.  888-07D13 was nominally collateralized by the funds in 888-07D12.[1]

36.    Accounts 888-07D12 and 888-07D13 were supervised continuously by Brubacher, who, for example, approved Bellmore's request in early January 2009 to allow the Solar Wind Defendants to initiate wire transfers to withdraw funds from the account. Brubacher also received continuous updates about transfers to and from the account and about issues relating to account access.[2]

37.    From the very beginning, separate investor deposits were wrongly comingled in the 888-07D12 account. A January 2, 2009 email from Bellmore notes, "Funds from Trojan Productions, LLC and RARA, LLC are in the Solar Wind Productions, LLC WCMA account." Such comingling was not only known by Bellmore and the Solar Wind Defendants, but also known by Brubacher, who received alerts of all

---

[1]     A "Loan Management Account" is a product offered by Merrill Lynch that allows an account holder to take out multiple types of loans (e.g., a variable-rate line of credit *and* fixed-rate term loans) through the same account. The loaned funds come from Merrill Lynch directly and are collateralized by assets pledged by the account holder against the loans. Here, the pledged asset was apparently account 888-07D12.

[2]     On January 5, 2009, Bellmore wrote to Brubacher "giving [her] a heads up" on the initial wire transfers. Brubacher responded that such requests were "a big deal" and so "you need to call me on this asap." Brubacher then approved the transfers.

incoming wires, including the separate wires from Trojan Productions and RARA, LLC

on December 30, 2008, and December 31, 2008, respectively.[3]

38.    As shown by Merrill Lynch's own documents, less than one month after

opening account 888-07D12 to receive the deposits from Trojan Productions and RARA,

the Solar Wind Defendants had already withdrawn $117,250.00 in cash from it. Upon

information and belief, these funds were not withdraw to fund Trojan Production's or

RARA's films, but rather to meet the Solar Wind Defendants' own expenses and to fund

other fraudulent schemes.[4]

39.    On January 20, 2009, the Solar Wind Defendants purchased for $200,000

a "CD EUROBANK." As of January 30, 2009, 888-07D12 had $21,495.12 in cash and

the CD EUROBANK, then worth $199,651.80.

40.    Through February and March 2009, the raiding of Trojan Productions'

and RARA's deposits continued, including unaccountable expenses such as a $5,000

check on March 10, 2009, to Michael Jacobs personally and a $30,000 check on March

27, 2009, to Solar Wind Productions LLC.

41.    Since the cash in 888-07D12 was exhausted quickly, the Solar Wind

Defendants in early February 2009 began drawing upon the 888-07D13 account for

---

[3]    Indeed, on March 17, 2009, still before Plaintiffs' deposit, Brubacher was *again* informed of the comingling by way of a "wire transfer deposit inquiry" sent to her by Denise Holmes, of Merrill Lynch's Client Bookkeeping and Credit Control office.

[4]    In separate litigation, Trojan Productions has alleged not only that these expenses were wrongful, but that the Solar Wind Defendants expressly misrepresented to Trojan Productions that the deposit had not even cleared the bank until January 24, 2009. In reality, as shown by the account statements, by that date the Solar Wind Defendants had already converted more than $100,000 of Trojan Productions' deposit.

"loan advances." These funds were then rapidly spent on such wrongful charges as checks to the Solar Wind Defendants themselves.

42.    By March 31, 2009, only $10,268.25 in cash remained in the 888-07D12 account.  Through the 888-07D13 account, Merrill Lynch had advanced to the Solar Wind Defendants $155,177.83, a debt secured against the CD EUROBANK in 888-07D12. In the course of three months, the Solar Wind Defendants had converted more than $25,000 of Trojan Production's and RARA's cash and had incurred a debt of more than $150,000 secured against a CD purchased with those investor's funds.

**F.    Bellmore, Brubacher and Merrill Lynch's Knowledge of, and Participation in, the Solar Wind Defendants' Fraud Prior To Plaintiffs' Deposit**

43.    As alleged *supra*, though Bellmore, Brubacher, and Walton were all aware by mid-March 2009 that the Solar Wind Defendants had wrongly used the Merrill Lynch documents to solicit investors, neither Bellmore, Brubacher, nor Walton informed the Plaintiffs of this material fact.

44.    Since the opening of the account in December 2008, Bellmore, Brubacher and other individuals at Merrill Lynch (such as Miriam Martin and Alvin Walton) were aware not only of transactions going in and out of the account, but also of the Solar Wind Defendants' business dealings. On January 7, 2009, for example, Bellmore forwarded to Brubacher a copy of the Solar Wind Defendants' "Business Model."

45.    In addition to the improper solicitation identified above, by mid-March 2009 a dispute had arisen between the Solar Wind Defendants and John Davis, whom the Solar Wind Defendants had misrepresented to the Plaintiffs (and apparently others) as being the Chief Financial Officer of Solar Wind Productions.

46.     On March 16, 2009, Bellmore wrote to Brubacher to ask how he should respond to a request from John Davis for a wire transfer. Bellmore asked Brubacher, "Do I tell him his account is frozen?" On March 17, 2009, Bellmore wrote to Brubacher to update her on the dispute, and to ask that the account be "freed up" to accept the Plaintiffs' deposit.

47.     Bellmore, Brubacher and Merrill Lynch knew the Solar Wind Defendants' business dealings would adversely affect Plaintiffs. On March 18, 2009, Bellmore forwarded to Brubacher and two attorneys at a private firm an email exchange he had with Metcalf, apparently to request advice as to how he should handle Plaintiffs' deposit in light of the fraudulent activity in the accounts.

48.     Rather than freeze the account and alert the Plaintiffs in light of the aforementioned suspicious and wrongful activity, including the improper solicitation of the Plaintiffs and the dispute with John Davis, Bellmore, Brubacher and Merrill Lynch ensured that the 888-017D12 account would be able to accept Plaintiffs' deposit. Further, instead of properly freezing the account and alerting the Plaintiffs, Bellmore and Brubacher misrepresented to the Plaintiffs the nature of the fund, falsely claiming that it was "inside" Merrill Lynch and that their funds would be secured and monitored.

49.     As Plaintiffs later learned, the above conduct regarding Trojan's funds had prompted John Davis, the individual whom Defendants had held out as the Chief Financial Officer of Solar Wind LLC, to wholly extricate himself from Solar Wind LLC and to refuse to be involved with them in any capacity. As Plaintiffs later learned, John Davis had never even been the Chief Financial Officer of Solar Wind LLC.

## G.     Defendants' Conversion of Plaintiffs' Funds

50.     On April 1, 2009, the same day Plaintiffs' deposited their funds, counsel for Trojan Productions wrote to Bellmore, noting that Bellmore had told Trojan Productions there was "no money" remaining in 888-017D12 and demanding that Merrill Lynch restore Trojan Productions' deposit to the account. The next day, April 2, 2009, Bellmore forwarded the message to Brubacher, writing "The feared has begun."

51.     Less than two hours later, he wrote to Plaintiffs, "The funds show in the Solar Wind account."

52.     Later that day, counsel for Trojan Productions wrote a follow-up to Merrill Lynch, again demanding return of the funds and stating that Trojan Productions had terminated its contract with the Solar Wind Defendants.

53.     Even though "the feared [had] begun" with regard to the Solar Wind accounts and the funds in the account were already in dispute, Bellmore, Brubacher and Merrill Lynch did nothing to protect Plaintiffs' deposit. Instead, on April 3, 2009, Bellmore forwarded to *the Solar Wind Defendants, but not Plaintiffs*, documentation necessary for establishing the subaccount that all Defendants had represented to Plaintiffs was already established. This message was carbon copied to Brubacher.

54.     Throughout early April 2009, Defendants gave Plaintiffs a number of confusing, conflicting and false explanations for why their funds had not been transferred to an appropriate subaccount under Plaintiffs' control. Defendants never explained the real status of the account.

55.     On April 8, 2009, the Solar Wind Defendants withdrew $5,000.00 from 888-017D12. This transfer was not authorized by Plaintiffs, nor were Plaintiffs informed of it.

15

56.     On April 10, 2009, the Solar Wind Defendants withdrew $5,000.00 from 888-017D12. This transfer was not authorized by Plaintiffs, nor were Plaintiffs informed of it.

57.     Between April 10 and April 12, 2009, $407.32 was also spent out of the 888-017D12 account by way of a Visa card. This transfer was not authorized by Plaintiffs, nor were Plaintiffs informed of it.

58.     On April 17, 2009, Bellmore forwarded to Alvin Walton an email he had sent the Solar Wind Defendants that day about "mov[ing] $200K from Solar Wind to Solar Wind sub account."

59.     On April 20, 2009, the CD EUROBANK was sold for $199,874.00, the proceeds of which were deposited into 888-017D12. This transfer was not authorized by Plaintiffs, nor were Plaintiffs informed of it.

60.     On April 22, 2009, Plaintiffs contacted Merrill Lynch's offices "numerous times"[5] to demand Merrill Lynch return Plaintiffs' funds, and spoke with a number of individuals, including Brubacher. That same day, Merrill Lynch secretly transferred $166,060.74 — the exact amount needed, including finance charges, to satisfy the 888-017D13 debt — from 888-017D12 to 888-017D13. This transfer was not authorized by Plaintiffs, nor were Plaintiffs informed of it.

61.     On April 23, 2009, Merrill Lynch used the $166,060.74 transferred to 888-017D13 to satisfy Solar Wind Productions' debt to Merrill Lynch. This transfer was not authorized by Plaintiffs, nor were Plaintiffs informed of it.

---

[5]     The phrase "numerous times" language comes from Merrill Lynch's own pleading in the New Mexico case.

62.   On April 27, Brubacher sent out a memo to "OMT, Mgrs Assts and Ops Staff" instructing all Merrill Lynch employees not to communicate with any of the Plaintiffs and to refer all such calls to her or to Merrill Lynch's outside counsel.

63.   On several occasions thereafter, Plaintiffs spoke with Brubacher and Merrill Lynch's outside counsel, each of whom assured Plaintiffs their deposit was "intact" and "separate" from other funds. These statements were false and were known to be false when they were made.

64.   On or about May 19, 2009, Plaintiffs gave the Solar Wind Defendants written notice that any understandings or agreements between them had been terminated and/or rescinded. Oral notice had already been provided. Defendants continued to refuse Plaintiffs access to the deposit.

65.   As of the filing of this Amended Complaint, approximately 54% of the investors' deposits have been interpleaded into New Mexico state court. It is unclear where the remainder of the deposits are, but it is known that $166,060.74 of those deposits was secretly withdrawn by Merrill Lynch, and Plaintiffs believe the Solar Wind Defendants have the remainder. As of the filing of this Complaint, Defendants have not refunded any sums at all to the Plaintiffs, but have instead claimed entitlement to the respective sums they have taken.

66.   Defendants' wrongful conversion and withholding of Plaintiffs' deposit has caused substantial damage to Plaintiffs.

67.   The film planned by Plaintiffs Parents LLC, Hartly, Metcalf and FilmWest LLC has been delayed indefinitely and has lost other financing opportunities.

68.   Plaintiffs Hartly and FilmWest LLC have suffered direct and consequential damages to their film production business, including damage to their reputations and business goodwill.

69.   Plaintiffs Metcalf and SunWest Inc. have suffered direct and consequential damages by the loss of the deposit and the loss of its timely return, including damage to their seasonal apparel or costume business, such as the inability to secure commercial leases for retail spaces, the inability to acquire necessary inventory for later sale, and damage to their reputations and business goodwill.

## COUNT I

### Plaintiffs v. Defendants

### Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. §§ 1961-1968

70.   The above averments are incorporated here by reference.

71.   Defendants Merrill Lynch, Solar Wind LLC, and Rio Grande Studios, engage in, and their activities affect, interstate commerce.

72.   All Defendants are employed by or associated with Defendants Merrill Lynch, Solar Wind LLC, or Rio Grande Studios.

73.   All Defendants have together operated as an association-in-fact with the purpose of defrauding investors.

74.   All Defendants have received illicit income derived from, and have conducted or participated in, a pattern of misleading film investors — including Trojan Productions, RARA LLC, and Plaintiffs — by way of a pattern of mail fraud and wire fraud into depositing funds into accounts controlled by Defendants.

75.     Defendants have then, on dozens of occasions[6], converted said funds into their own income and then used part or all of that income, or the proceeds of that income, in the operation of Merrill Lynch, Solar Wind LLC, and Rio Grande Studios.

76.     Defendants Bellmore, Brubacher, Jacobs and Ruby-Handler Jacobs have conducted or participated in the conduct of Merrill Lynch, Solar Wind LLC and Rio Grande Studios through a pattern of misleading film investors by way of mail fraud and wire fraud into depositing funds into accounts controlled by Defendants, from which they have withdrawn and converted those funds without authorization.

77.     Defendants have violated the provisions of 18 U.S.C. §§ 1961(a) and (c).

78.     Defendants have violated 18 U.S.C. § 1961(d) by conspiring to violate the provisions of 18 U.S.C. §§ 1961(a) and (c).

79.     As described above, Plaintiffs were directly and indirectly injured by this racketeering activity, including through conversion of their funds and damage resulting from said conversion, and from the Defendants' use or investment of racketeering proceeds from prior schemes to fund their scheme against the Plaintiffs.

WHEREFORE, Plaintiffs respectfully request this Court enter a judgment against Defendants for threefold of the direct and consequential economic and noneconomic damages they have sustained by reason of the above violations, for punitive damages, and for costs of suit and attorney's fees.

---

[6]     The statements for accounts 888-07D12 and 888-07D13 at Merrill Lynch reveal dozens of transactions, including more than $350,000.00 in withdrawals, that were unauthorized by any of the investors.

## COUNT II

### Plaintiffs v. Defendants

### Fraud

80.  The above averments are incorporated here by reference.

81.  As described above, Defendants Jacobs, Jacobs-Handler, Solar Wind LLC, and Rio Grande Studios intentionally, recklessly and knowingly made numerous misstatements of material fact to Plaintiffs Parents LLC, FilmWest LLC, Hartly and Medcalf, including, but not limited to:

(a)  The Jacobs', Solar Wind LLC's, and Rio Grande Studios' intentions with regard to the deposit;

(b)  The history of, nature of, and officers of Solar Wind LLC, including misrepresentations regarding Solar Wind LLC's ability and desire to develop financing for films, Solar Wind LLC's adequate and appropriate handling of other producers' funds, and the identity of Solar Wind LLC's chief financial officer;

(c)  The instructions they had given to Bellmore and Merrill Lynch regarding the path of the funds once deposited;

(d)  The terms of a modified financing agreement sent to Hartly for her acceptance prior to the deposit; and

(e)  The status of the funds once deposited.

82.  Defendants Merrill Lynch, Bellmore and Brubacher were aware of some or all these misrepresentations, yet took no action to correct the misrepresentations or to prevent the Solar Wind Defendants from profiting from the misrepresentations, such as by freezing their accounts.

83.     Defendants Bellmore and Brubacher, on behalf of Merrill Lynch, further expressly misrepresented to the Plaintiffs the nature of the film fund, the role Merrill Lynch would play in supervising and managing that Fund, and the status of Plaintiffs' funds once they were deposited.

84.     As described above, Plaintiffs relied upon these material misrepresentations and others to their detriment, including by tendering the deposit to Defendants. As described above, Plaintiffs have been seriously damaged by their reliance upon Defendants' misrepresentations.

85.     The above named Defendants' conduct was of such an outrageous character that it warrants the imposition of punitive damages.

WHEREFORE, Plaintiffs respectfully request this Court enter a judgment against Defendants in compensation of the direct and consequential economic and noneconomic damages they have suffered, as well as punitive damages, costs of suit, and attorney's fees.

## COUNT III

### Plaintiffs v. Defendants

### Conversion

86.     The above averments are incorporated here by reference.

87.     As described above, Plaintiffs provided to Defendants a $200,000.00 Development Deposit for transfer to a specific subaccount, where it would be used in obtaining financing for and/or in production of a feature film.

88.     Instead of using said deposit for its appropriate purposes, Defendants wrongfully converted the funds by detaining the funds in an account they, and only they,

controlled, and from which they were converting other innocent third party funds for their private use.

89.    Defendants Brubacher and Merrill Lynch, after terminating Bellmore, used Plaintiffs' deposit to satisfy a debt the Solar Wind Defendants had to Merrill Lynch.

90.    Plaintiffs have already wrongfully been denied use of said funds to their detriment.

91.    As of the filing of this Amended Complaint, approximately 54% of the investors' deposits have been interpleaded into New Mexico state court. It is unclear where the remainder of the deposits are, but it is known that $166,060.74 of those deposits was secretly withdrawn by Merrill Lynch, and Plaintiffs believe the Solar Wind Defendants have the remainder. As of the filing of this Complaint, Defendants have not refunded any sums at all to the Plaintiffs, but have instead claimed entitlement to the respective sums they have taken.

92.    Plaintiffs have already been harmed by the inability to utilize their own funds, and it appears that, even if they prevail in the interpleader in which the Solar Wind Defendants have wrongly claimed an interest in the funds, Plaintiffs still will not recover the full $200,000.00 they deposited.

93.    The above named Defendants' conduct was of such an outrageous character that it warrants the imposition of punitive damages.

WHEREFORE, Plaintiffs respectfully request this Court enter a judgment against Defendants in compensation of the direct and consequential economic and noneconomic damages they have suffered, as well as punitive damages, costs of suit, and attorney's fees.

## COUNT IV

### Plaintiffs v. Defendants

### Conspiracy

94.   The above averments are incorporated here by reference.

95.   As described above, all Defendants have, in furtherance of wrongful conduct aimed at Plaintiffs, conspired together with the common aim of injuring Plaintiffs personally and in their businesses.

96.   The above named Defendants' conduct was of such an outrageous character that it warrants the imposition of punitive damages.

WHEREFORE, Plaintiffs respectfully request this Court enter a judgment against Defendants in compensation of the direct and consequential economic and noneconomic damages they have suffered, as well as punitive damages, costs of suit, and attorney's fees.

## COUNT V

### Plaintiffs v. Defendants Bellmore, Brubacher, and Merrill Lynch

### Breach of Fiduciary Duty

97.   The above averments are incorporated here by reference.

98.   As described above, the Plaintiffs provided funds to the Defendants for the specific purpose of obtaining a CD which would then be used to obtain a line of credit which in turn would be used for obtaining further financing for the film or for paying production costs of the film.

99.   The Defendants represented to the Plaintiffs an expertise in, and pretense of, financial management and the safekeeping of funds, and represented they would care for, advise upon, and manage funds deposited by the Plaintiffs.

100.    The representations to Plaintiffs and the tender of said funds to the Defendants created and carried with it a fiduciary duty on the part of the Defendants to care for said funds in a reasonable and appropriate manner.

101.    The Defendants failed to carry out this duty, and instead intentionally, recklessly, knowingly and/or negligently failed to protect said funds, including by:

    a.    misrepresenting the relationship between the Defendants;

    b.    misrepresenting the nature of the accounts established at Merrill Lynch;

    c.    misrepresenting the appropriate method for making a deposit to the Parents LLC subaccount;

    d.    misrepresenting that the funds, once tendered, would be transferred to the Parents LLC subaccount and converted into a CD;

    e.    misrepresenting the status of the deposit once made;

    f.    failing to detect suspicious conduct, including comingling of funds, in the Solar Wind LLC account prior to the deposit;

    g.    failing to react to known wrongful conduct, including Solar Wind LLC's mishandling and conversion of Trojan's funds, prior to the deposit;

    h.    failing to freeze the Solar Wind LLC account, refuse Plaintiffs' deposit, or segregate Plaintiffs' deposit upon Trojan's demand for the funds, which was made prior to transfer of the deposited funds;

    i.    permitting other Defendants access to the funds once learning of Trojan's demand;

j.    failing to freeze Plaintiffs' deposit after it knew, or should have known, of suspicious or wrongful activity in the accounts;

k.    failing to return Plaintiffs' deposit upon demand;

l.    wrongly transferring Plaintiffs' funds to satisfy the Solar Wind Defendants' debt to Merrill Lynch; and,

m.    as to Merrill Lynch only, asserting that it is uncertain as to the ownership of Plaintiffs' funds.

102.   As of the time of filing of this Complaint, the funds are also the subject of an interpleader action in another jurisdiction, and thus unavailable to Plaintiffs, and at risk of never being returned to Plaintiffs at all.

103.   Defendants' conduct was of such an outrageous character that it warrants the imposition of punitive damages.

WHEREFORE, Plaintiffs respectfully request this Court enter a judgment against Defendants in compensation of the direct and consequential economic and noneconomic damages they have suffered, disgorgement of any compensation earned related to management of the funds, and punitive damages, costs of suit, and attorney's fees.

## COUNT VI

### Plaintiffs v.
### Defendants Michael Jacobs, Ruby Handler-Jacobs and Solar Wind LLC Productions

### Breach of Fiduciary Duty

104.   The above averments are incorporated here by reference.

105.   As described above, the Plaintiffs provided funds to the Defendants for the specific purpose of obtaining a CD which would then be used to obtain a line of credit

which in turn would be used for obtaining further financing for the film or paying production costs of the film.

106.   The Defendants represented to the Plaintiffs an expertise in, and pretense of, financial management and the safekeeping of funds, and represented they would care for, advise upon, and manage funds deposited by the Plaintiffs.

107.   The representations to Plaintiffs and the tender of said funds to the Defendants created and carried with it a fiduciary duty on the part of the Defendants to care for said funds in a reasonable and appropriate manner.

108.   The Defendants failed to carry out this duty, and instead intentionally, recklessly, knowingly and/or negligently failed to protect said funds , including by:

109.   The Defendants failed to carry out this duty, and instead intentionally, recklessly, knowingly and/or negligently failed to protect said funds, including by:

    a.    misrepresenting the relationship between the Defendants;

    b.    misrepresenting the nature of the accounts established at Merrill Lynch;

    c.    misrepresenting the appropriate method for making a deposit to the Parents LLC subaccount;

    d.    misrepresenting that the funds, once tendered, would be transferred to the Parents LLC subaccount and converted into a CD;

    e.    misrepresenting the status of the deposit once made;

    f.    mishandling the Solar Wind LLC account, including by comingling of funds and failing to maintain an appropriate accounting;

g.    failing to freeze the Solar Wind LLC account, refuse Plaintiffs' deposit, or segregate Plaintiffs' deposit upon Trojan's demand for the funds, which was made prior to transfer of the deposited funds;

h.    accessing the funds after learning of Trojan's demand;

i.    failing to freeze Plaintiffs' deposit after Trojan's demand;

j.    failing to return Plaintiffs' deposit upon demand; and,

k.    asserting that they have an interest in Plaintiffs' deposit.

110.    As of the time of filing of this Complaint, the funds are also the subject of an interpleader action in another jurisdiction, and thus unavailable to Plaintiffs, and at risk of never being returned to Plaintiffs at all.

111.    The above named Defendants' conduct was of such an outrageous character that it warrants the imposition of punitive damages.

WHEREFORE, Plaintiffs respectfully request this Court enter a judgment against Defendants in compensation of the direct and consequential economic and noneconomic damages they have suffered, and punitive damages, costs of suit, and attorney's fees.

## COUNT VII

### Plaintiffs Parents LLC and FilmWest LLC v. Defendant Solar Wind LLC

### Declaratory Judgment

112.    The above averments are incorporated here by reference.

113.    Defendant Solar Wind LLC has asserted to the Plaintiffs Parents LLC and FilmWest LLC, and asserted in pleadings filed in other jurisdictions, that it has enforceable agreements with Plaintiffs Parents LLC and FilmWest LLC.

114.    Any such "agreement" is unenforceable.

115.    On March 9, 2009, Mr. and Mrs. Jacobs forwarded to the Plaintiffs a draft "Financing Agreement," which Plaintiffs rejected because: the draft required all deposits be with Merrill; the draft did not adequately ensure Plaintiffs' ability to recover parts of the deposit on a predefined schedule; the draft did not clearly require that the Film Fund Holding Account and the Certificate of Deposit be subject to joint signatures; the draft did not accurately reflect the role of Parents LLC; and, various other parts of the Agreement needed to be modified for clarity.

116.    After several phone calls between the parties, on March 12, 2009, Plaintiffs forwarded a modified draft designed to correct the aforementioned issues, attached hereto as Exhibit B.

117.    On March 16, 2009, Jacobs sent a new draft of the "Financing Agreement," which he repeatedly and falsely represented orally as having incorporated the changes demanded by Plaintiffs. Unbeknownst to Plaintiffs, the draft did not actually incorporate the changes demanded.

118.    On March 18, 2009, Jacobs sent a new draft of the "Financing Agreement," attached hereto as Exhibit C, that corrected two typographical errors. Jacobs again repeatedly and falsely represented orally as having incorporated the changes demanded by Plaintiffs. Unbeknownst to Plaintiffs, the draft did not actually incorporate the changes demanded.

119.    Plaintiff Hartly was scheduled to undergo surgery on March 19. 2009. Jacobs and Bellmore nonetheless repeatedly pressured her and Plaintiff Metcalf to send a signature page immediately, or else they would derail the project. Jacobs also repeatedly and falsely represented the new draft  incorporated all of the changes

28

demanded by Plaintiffs. Pursuant to Jacobs' instructions, and in reliance upon Jacobs' representations that he had made the changes demanded, Plaintiff Hartly reviewed and signed only the signature page.

120.   Subsequent to the deposit, Plaintiffs learned the changes they had demanded were not actually incorporated in the Financing Agreement. On May 19, 2009, Plaintiffs reiterated in writing that they did not believe the agreement was effectively executed, and asserted that, to the extent it was executed, it was terminated.

121.   The Financing Agreement was never executed due to Defendants' misrepresentations about its contents, and so is not enforceable against Plaintiffs.

122.   In light of the highly conditional nature of the agreement — in which the parties' obligations changed as the project progressed — the agreement was unsupported by consideration because the Defendants were under no obligation to the Plaintiffs until the working line of credit was established, which indisputably did not happen.

123.   The Financing Agreement was terminated in its entirety.

124.   The Financing Agreement was fraudulently induced.

125.   Defendants' rights under the Financing Agreement were waived by the Defendants through their willful default in this case.

WHEREFORE, Plaintiffs Parents LLC and FilmWest LLC respectfully request this Court enter a declaratory judgment against Defendant Solar Wind LLC establishing that Defendant has no enforceable agreement with Plaintiffs.

## COUNT VIII

### Plaintiffs Parents LLC and FilmWest LLC v. Defendant Solar Wind LLC

### Breach of Contract

126. The above averments are incorporated here by reference.

127. This count is raised in the alternative pursuant to Fed. R. Civ. P. 8(d)(2) & (3).

128. As described above, Defendant Solar Wind LLC has claimed it has one or more enforceable agreements with Plaintiffs Parents LLC and FilmWest LLC.

129. If this Court finds said agreements valid and binding, then Plaintiffs allege that Defendant Solar Wind LLC has not complied with the terms of said agreements, but instead has willfully breached them by refusing to use (and, failing that, to return) the Development Deposit as required by those agreements.

WHEREFORE, Plaintiffs Parents LLC and FilmWest LLC respectfully request this Court enter judgment in their favor and against Defendant Solar Wind LLC for direct and consequential damages arising from Defendant's breach of their agreements with Plaintiffs.

### DEMAND FOR JURY TRIAL

Plaintiffs demand a trial by jury for all causes of action and issues so triable.

### NOTICE OF PRESERVATION OF EVIDENCE

PLAINTIFFS HEREBY DEMAND THAT DEFENDANTS TAKE ALL NECESSARY ACTION TO ENSURE THE PRESERVATION OF ALL DOCUMENTS, COMMUNICATIONS, WHETHER ELECTRONIC OR OTHERWISE, ITEMS AND THINGS IN THE POSSESSION OR CONTROL OF ANY PARTY TO THIS ACTION (OR

ANY ENTITY OVER WHICH ANY PARTY TO THIS ACTION HAS CONTROL, OR FROM WHOM ANY PARTY TO THIS ACTION HAS ACCESS TO) WHICH MAY IN ANY MANNER BE RELEVANT TO OR RELATE TO THE SUBJECT MATTER OF THE CAUSES OF ACTION AND/OR THE ALLEGATIONS OF THIS COMPLAINT.

THE BEASLEY FIRM, LLC


_____/s/ Maxwell S. Kennerly_____
Maxwell S. Kennerly, Esquire
The Beasley Building
1125 Walnut Street
Philadelphia, PA 19107
215.592.1000
215.592.8360 (facsimile)

Attorney for Plaintiffs

Dated: June 7, 2011