# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

LINDA METCALF, MICHELLE   :   No. 4:11-CV-00127
HARTLY, FILMWEST   :
PRODUCTIONS, LLC, SUNWEST   :   (Judge Brann)
CAPITAL MANAGEMENT, Inc.   :
d/b/a SPIRIT HALLOWEEN,   :
DO YOU KNOW WHERE YOUR   :
PARENTS ARE, LLC   :
  :
    Plaintiffs,   :
  :
   v.   :
  :
MERRILL LYNCH, PIERCE,   :
FENNER & SMITH, Inc. and   :
ROBIN BRUBACHER,   :
  :
    Defendants.   :

## MEMORANDUM OPINION

### OCTOBER 10, 2017

Defendants Merrill Lynch, Pierce, Fenner & Smith, Inc. ("Merrill Lynch") and Robin Brubacher filed a Motion for Summary Judgment[1] against Plaintiffs Linda Metcalf, Michelle Hartly, FilmWest Productions, LLC ("FilmWest"), Sunwest Capital Management, Inc. d/b/a Spirit Halloween ("Sunwest"), and Do You Know Where your Parents Are, LLC ("Parents"). For the reasons that follow, Defendants' motion is granted in part and denied in part.

---

[1] ECF No. 213.

# I. BACKGROUND

## A. Ms. Metcalf's Screenplay and Collaboration with Ms. Hartly

In 2003, Ms. Metcalf began working on a screenplay titled "Do You Know Where Your Parents Are?"[2]  Hoping to turn her script into a motion picture, she engaged the film production services of FilmWest and its producer-manager, Ms. Hartly.  The parties signed a Term Sheet memorializing their relationship in 2008.[3]

## B. Plaintiffs' Initial Contact with the Jacobses

That same year, while looking for a way to finance the film's production, Ms. Hartly became acquainted with Michael Jacobs and his wife, Ruby Handler-Jacobs ("the Jacobses"), owners of Solar Wind Productions, LLC ("Solar Wind"), a film production company based in Albuquerque, New Mexico.[4]  The parties apparently discussed Plaintiffs' financing needs, and on January 8, 2009, Mr. Jacobs sent an email to Ms. Hartly containing a "Welcome Packet" that, in his words, "explains the process" by which Plaintiffs could obtain the desired financing.[5]

---

[2]   ECF No. 215, Ex. B (Metcalf Dep.) at 7.

[3]   ECF No. 215, Ex. C.

[4]   ECF No. 215, Ex. G (Hartly Dep.) at 381-82.

[5]   ECF No. 215, Ex. H.

The Welcome Packet explained the financing process in some detail, and contained several documents.[6]  According to a "Film Funding Process Step by Step Chart," a producer interested in the Jacobses' program first needed to submit her proposed film's script, cast list, and production budget to Solar Wind for approval.[7]  Solar Wind would then calculate an "Adjusted Production Budget" – *i.e.*, the producer's submitted production budget increased by Solar Wind's fees (which ranged from 10.6% to 12.5% of that budget).[8]  The producer then needed to complete and return a "Brokerage House Package" in order to create an account at an unidentified "Brokerage House."[9]  After the producer provided "Proof of Funds" and the parties signed a "Financing Agreement," Solar Wind would "provide[] wiring instructions" and the producer would wire a 10% "Development Deposit" into the Brokerage House account.[10]

The Welcome Packet contained two other documents:  a "Funding Flow Chart" which essentially reproduced the Step by Step Chart in visual form, and a "Non-Disclosure, Confidential, and Non-Circumvention Agreement," which protected the Financing Agreement and discussions about that agreement.[11]

---

[6]   *Id.*

[7]   ECF No. 215, Ex. H, Film Funding Step by Step Chart ¶¶ II, V.

[8]   *Id.* ¶ VII.

[9]   *Id.* ¶ VIII.

[10]   *Id.* ¶¶ VIII-XIV.

[11]   ECF No. 215, Ex. H.

## C. Plaintiffs' Further Contact with the Jacobses

Later in January 2009 – apparently after Ms. Hartly signed and returned the Non-Disclosure, Confidential, and Non-Circumvention Agreement – Mr. Jacobs emailed several more documents to her.[12] One of these documents was a "Financing Program Summary" that reiterated the process outlined in the Welcome Packet documents and added other details about the "proprietary Solar Wind Production's Film Fund Mechanism."[13] It indicated, for example, that the prospective producer would be "listed as a co-signatory on the holding account" containing the Development Deposit, that the Development Deposit, "[u]pon . . . receipt," would be "converted to a Certificate of Deposit ("CD") or similar instrument . . . for no less than a 3 month term," and that the producer would be "listed as a co-signatory on the CD."[14] Next, a "Secured Working Capital Line of Credit" would be "obtained against the CD as collateral" and "applied to obtain total film financing."[15] And finally, "[d]raw down" of funds from the line of credit would "follow the schedule" approved by Solar Wind and the producer, but "[i]n the unlikely event that funding is not delivered within the estimated or reasonable

---

[12]   ECF No. 215, Ex. I.

[13]   *Id.*, Financing Program Summary 1.

[14]   *Id.*

[15]   *Id.*

time frame," the Development Deposit would be returned.[16] The summary also noted that after the film was produced and earning money, Solar Wind would receive 90% of the "net income" until "full recoupment," at which point it would continue to receive 55% of "net revenues."[17]

Another document sent by Mr. Jacobs in January 2009 was a "Production Finance Flow Chart for 'Production' Milestones," which again summarized Solar Wind's financing program, repeating that the Development Deposit would be placed into an account "with the names of both the Depositor [*i.e.*, the producer] and the [Solar Wind] CFO or designee."[18] Additionally, it revealed that Solar Wind would obtain the necessary financing by "pledg[ing] additional collateral required to obtain private finance."[19]

Also emailed by Mr. Jacobs to Ms. Hartly at this time – the most pertinent, perhaps, for purposes of this motion – was Solar Wind's "Brokerage Package," which provided instructions to prospective producers for transferring their Development Deposit to the earlier-referenced "Brokerage House" – *i.e.*, to Merrill Lynch.[20] The Brokerage Package began with a "Document Request List," which noted the paperwork needed for opening a "Merrill Lynch Sub-Account" and

---

[16] *Id.*

[17] *Id.* at 2.

[18] ECF No. 215, Ex. I, Production Finance Flow Chart for "Production" Milestones ¶ 7.

[19] *Id.*

[20] ECF No. 215, Ex. I, Brokerage Package.

indicated that such paperwork – which included corporate filings, a copy of a photographic identification, and an IRS tax ID number – was to be delivered to Lawrence Bellmore, a financial advisor at that firm.[21] The List provided Mr. Bellmore's phone number, fax number, email address, and physical mailing address at his Merrill Lynch office in Williamsport, Pennsylvania.[22]

The Package then contained two sets of "Instructions" – one for prospective producers who were already Merrill Lynch clients, and one for those who were not – which indicated that Development Deposits should be placed into a "designated Sub-Account of Solar Wind Productions Account Number 888-07D12; project designated Sub-Account Number to be determined."[23] The Instructions also noted that "[a]ny questions regarding . . . the Merrill Accounts and the Development Deposit Process should be directed to [Mr.] Bellmore" at one of two listed telephone numbers.[24]

Finally, the Package included various documents on Merrill Lynch letterhead or bearing Merrill Lynch insignia, including a professional profile of Mr.

---

[21] ECF No. 215, Ex. I, Brokerage Package, Merrill Lynch Due Diligence Documentation Requirement.

[22] *Id.*

[23] ECF No. 215, Ex. I, Instructions for Solar Wind Productions LLC Clients who are NOT also Clients of Merrill Lynch; ECF No. 215, Ex. I, Instructions for Solar Wind Productions LLC Clients who are also Clients of Merrill Lynch.

[24] *Id.* at 2.

Bellmore, information about Merrill Lynch's "Insured Savings Account," and various account applications.[25]

### D. Financing Agreement Between Solar Wind and FilmWest

Throughout February and March of 2009, Solar Wind and the plaintiffs negotiated the terms of – and finally signed – a "Financing Agreement."[26] In its final form, the Financing Agreement noted that Solar Wind would "deploy [its] proprietary structured finance investment strategies for the purpose of obtaining the total final production funding as provided for in this Agreement,"[27] and that Solar Wind "shall direct and manage the execution of all processes related to the provision of film production financing."[28] It indicated that "[u]pon termination of this Agreement for any reason, including [Solar Wind's] failure to secure the requisite financing during the Initial Financing Period . . . [the Development] Deposit . . . shall be returned . . . no later than 30 days from effective date of termination."[29] Although the agreement noted that plaintiffs were obligated "to provide the [Development] Deposit to [Solar Wind's] Selected Brokerage Firm, or Merrill Lynch, per the instructions as provided by the Brokerage Firm Financial

---

[25] ECF No. 215, Ex. I.

[26] ECF No. 215, Exs. L and M (emails between Mr. Jacobs and Ms. Hartly).

[27] ECF No. 215, Ex. N at 2.

[28] *Id.* ¶ 6.

[29] *Id.* ¶ 8.

Advisor,"[30] neither Merrill Lynch nor any of its employees or agents were a party to the agreement.[31]

### E. Solar Wind's Accounts at Merrill Lynch

Solar Wind first opened a deposit account at Merrill Lynch – numbered 888-07D12 (the "D12 Account")– in December 2008, several weeks before the Plaintiffs made contact with the Jacobses.[32]  A few weeks after opening the D12 Account, on January 28, 2009, Solar Wind also opened a line of credit (called a "Loan Management Account," or "LMA") at Merrill Lynch, pledging the funds in the D12 Account as collateral.[33]

### F. Merrill Lynch's Knowledge of Solar Wind's Financing Program

Plaintiffs claim that various individuals at Merrill Lynch acquired knowledge of – and internally expressed concerns about – Solar Wind and its financing program in early 2009.  On January 7, 2009, for example, Mr. Bellmore *may have* stated in an email that he had received a copy of the "Solar Wind Productions Business Model," which he had apparently "already sent to Robin

---

[30]  *Id.* at 2.

[31]  ECF No. 215, Ex. N; ECF No. 215, Ex. B at 123.

It is unclear from the record when the Financial Agreement was actually signed and entered into by all parties.  A copy of this agreement entered into the record was signed by the Jacobses – but not the plaintiffs – on March 12, 2009.  ECF No. 215, Ex. N at 23.  For purposes of this motion, the exact date of the parties' agreement is not relevant, but – based on the events described *infra* – it likely occurred sometime in March 2009.

[32]  ECF No. 122 ¶ 34; ECF No. 123 ¶ 34.

[33]  ECF No. 215, Ex. K.

[Brubacher,] our account manager for compliance review."[34]  On January 9, 2009, Mr. Bellmore *may have* stated in an email to Mr. Jacobs that "[t]he manner in which business is being transacted appears to be the pattern of money launderers[, and] you are putting your entire careers at risk and I am risking mine."[35]

On March 9, 2009, a vice president from a Merrill Lynch office in Pasadena, California, *may have* been shown Solar Wind solicitation materials by a client and *may have* expressed concern to Merrill Lynch's Office of General Counsel ("OGC") that these materials were part of "some sort of fraud."[36]  In response, OGC *may have* forwarded that information to, and discussed those concerns with, Merrill Lynch's office in Allentown, Pennsylvania.[37]  On March 13, 2009, someone at the Allentown office *may have* told Mr. Bellmore that Solar Wind could not use Merrill Lynch documents in its solicitation materials.[38]  And Merrill Lynch's corporate designee *may have* testified in deposition that such solicitation was "improper."[39]

---

[34]  ECF No. 217, Response to Defendants' Statement of Undisputed Facts ¶ 10.  The email itself does not appear in the record.

[35]  ECF No. 216, Ex. A (Expert Report of Peter W. Leibundgut) at 15-16 n.46.  The email itself does not appear in the record.

[36]  ECF No. 217, Response to Defendant's Statement of Undisputed Facts ¶ 13.

[37]  *Id.*

[38]  ECF No. 122 ¶ 17.

[39]  ECF No. 217, Response to Defendant's Statement of Undisputed Facts ¶ 13.  The portion of this deposition cited by Plaintiff's counsel does not appear in the record.

The Court is careful to note that the occurrence of the events described in the preceding two paragraphs is speculative – *i.e.*, all that can be said is that most of it "*may have*" happened. Throughout the papers filed in response to Defendants' Motion for Summary Judgment,[40] Plaintiffs' counsel makes repeated references to various emails and depositions, sometimes quoting those documents extensively. Plaintiffs' counsel, however, *has failed to enter those documents into the record.* The *only* exhibit attached to *any* of Plaintiffs' instant filings is an "Expert Report" prepared by a Mr. Peter W. Leibundgut – whom Plaintiffs characterize as a "banking expert" – whose report similarly quotes (again, sometimes extensively) from various emails and depositions *that do not appear in the record.*

The only record evidence on this matter shows that on March 18, 2009, Mr. Bellmore emailed Solar Wind's "Brokerage Package" to Ms. Brubacher and another Merrill Lynch employee, indicating that it was "the package sent by Michael Jacobs to his clients."[41]

As Plaintiffs' counsel is surely aware, when opposing a motion for summary judgment, the Federal Rules of Civil Procedure require a party to support its

---

[40] *I.e.*, Plaintiffs' Brief in Opposition to Defendant's Motion for Summary Judgment, ECF No. 216, and Response to Defendants' Statement of Undisputed Facts, ECF No. 217.

[41] ECF No. 217, Response to Defendant's Statement of Undisputed Facts ¶ 13. The entire email itself does not appear in the record; instead, Plaintiffs' counsel has inserted an image of (what may be only a portion of) that email within the text of this filing.

factual positions by "citing to particular parts of materials *in the record*."[42]   As examples of such *record* evidence, the Rules point to "depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials."[43]   It goes without saying that *ipse dixit* statements in a party's filings – such as descriptions of deposition testimony and purported quotations from various documents – are not "materials in the record."  Plaintiffs' counsel's deficit in this regard is particularly curious and vexing after the plethora of discovery disputes that occurred in this case – some of which were borderline puerile – which presumably allowed Plaintiffs' counsel to obtain the evidence necessary at this stage of the litigation to properly address a motion for summary judgment.

When replying to Plaintiffs' opposition to Defendants' motion for summary judgment, Defendants did not object to Plaintiffs' counsel's failure to compile the required record, though (again, as Plaintiff's counsel is surely aware) at the summary judgment stage, Defendants could have objected to such a practice, or "object[ed] that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence"[44] – *e.g.*, because it is hearsay.[45]

---

[42]   Federal Rule of Civil Procedure 56(c)(1)(A).

[43]   *Id.*

[44]   Federal Rule of Civil Procedure 56(c)(2).

For purposes of this motion, however, the Court will assume that the above-described events were properly supported by record evidence. Even though this undoubtedly helps bolster Plaintiffs' arguments, this accommodation will not, as discussed *infra*, affect the disposition of the instant motion.

### G. Plaintiffs' Interactions with Merrill Lynch

On March 16, 2009, Mr. Bellmore emailed Ms. Metcalf the "documents to open your account with Merrill Lynch,"[46] which Ms. Metcalf completed and faxed back later the same day.[47] These completed forms indicate that Plaintiffs were attempting to open a subaccount to the D12 Account, with Ms. Metcalf listed as the "primary contact" and the "authorized representative." Ms. Jacobs-Handler was listed as a "business partner" and the application indicated that she was to receive copies of certain mailings "for account of Solar Wind Productions."[48]

The next day, March 17, 2009, Mr. Bellmore emailed Ms. Brubacher, noting that:

---

[45] *See, e.g.*, *Smith v. City of Allentown*, 589 F.3d 684, 693 (3rd Cir. 2009) ("Hearsay statements that would be inadmissible at trial may not be considered for purposes of summary judgment."); *but see Shelton v. Univ. of Med. & Dentistry of N.J.*, 223 F.3d 220, 223 n.2 (3rd Cir. 2000) ("In this circuit, hearsay statements can be considered on a motion for summary judgment if they are capable of admission at trial.").

[46] ECF No. 215, Ex. P. This email was apparently sent from Mr. Bellmore's "personal email address."

[47] ECF No. 215, Ex. R.

[48] *Id.*

I have a new client for Solar Wind which I assisted in completing [account] docs last evening. They faxed over the completed application late last evening. I will be calling them today to get the profile form completed. They have faxed over some of the supporting documents as well. The wire will be $200K . . . I am still waiting on the final deposit required. The account will be in the name of the film and the producer/writer is going to be the managing member on the account. They will wire in the funds and complete all their documentation with Solar Winds and then modify the . . . account to pledge against the LMA.[49]

Despite apparently receiving and discussing the completed application forms, no account – or subaccount, for that matter – was ever opened for Plaintiffs at Merrill Lynch.[50]

### H. Plaintiffs' Deposit to Merrill Lynch

On April 1, 2009, Plaintiffs purchased a cashier's check made out to Solar Wind and deposited it into Solar Wind's D12 account at Merrill Lynch.[51] Although Ms. Metcalf testified in deposition that "the $200,000 was supposed to

---

[49] ECF No. 217, Response to Defendant's Statement of Undisputed Facts ¶ 22. The entire email itself does not appear in the record; instead, Plaintiff's counsel has inserted an image of (what may be only a portion of) that email within the text of this filing.

In a May 1, 2009 letter sent to Merrill Lynch Headquarters, Ms. Metcalf claims that Mr. Bellmore emailed her on March 16, 2009 – the day she received and returned the account application – stating that "[t]he contract" (perhaps the Financing Agreement) "calls for wiring funds to the Solar Wind Account and having 2 signatures on the account for the protection of Producer. That cannot be accomplished as it then gives Linda [Metcalf] authority over other client accounts and assets beyond the CD in the Solar Wind account and other sub accounts. Therefore, I setup the sub account for wiring funds directly to it. For the moment, Linda Metcalf is the only signature on the account and will be in control of the funds. Once the account is established we can add the CFO as the other signature on the sub-account and require two signatures from that point out." ECF No. 215, Ex. O ¶ 2. This email has not been entered into the record by either party.

[50] ECF No. 215, Ex. Q at 8, 29-30.

[51] ECF No. 215, Ex. S, Hartly Aff. ¶ 5; ECF No. 122 ¶ 27; ECF No. 123 ¶ 127.

be in my sole control,"[52] it was never used to purchase a CD nor was it transferred to any subaccount.

A few days later, on April 6, 2009, the administrative manager of Merrill Lynch's Allentown office emailed Plaintiffs' attorney, stating that

> It has come to our attention that you have received a set of documents entitled "Brokerage Package" from Solar Wind Productions, LLC, Michael Jacobs, and/or Ruby Jacobs . . . It is our understanding that those documents include certain forms published by Merrill Lynch . . . or otherwise refer to Merrill Lynch.
>
> This is to notify you that Merrill Lynch [is] not a sponsor of, or in any other way connected to any offering by [Solar Wind]. Furthermore, [Solar Wind] is not authorized to distribute Merrill Lynch materials. Please note that you may only open an account with Merrill Lynch through a Merrill Lynch financial advisor.[53]

Slightly more than two weeks later, on April 22, 2009, Ms. Metcalf contacted Merrill Lynch and asked for a return of her funds.[54] That same day, Merrill Lynch removed $166,060.74 from the D12 account – where Ms. Metcalf's $200,000 had been deposited – to satisfy the outstanding debt of Solar Wind's LMA account.[55]

---

[52]   ECF No. 215, Ex. B at 130.

[53]   ECF No. 215, Ex. S, Hartly Aff., Ex. 2.

[54]   ECF No. 122 ¶¶ 60-61; ECF No. 123 ¶¶ 60-61.

[55]   *Id.*

## I.    Trojan Productions

Plaintiffs were not the only individuals who sent money to Solar Wind's D12 account.  On January 6, 2009, before most of the events discussed *supra* took place, Mr. Bellmore emailed Ms. Brubacher about a "$275K wire" sent to the D12 Account by an organization named "Trojan Productions, Inc."[56]  Three months later, on April 1, 2009 – the same day, coincidentally, that Plaintiffs made their own deposit to Solar Wind's D12 Account – Trojan requested that its funds be transferred to a subaccount.[57]

## J.    Fallout Between Plaintiffs and Solar Wind

On May 19, 2009, FilmWest sent a letter to Solar Wind, terminating the parties' relationship.[58]  The letter noted that Solar Wind failed to deposit Plaintiffs' $200,000 into a subaccount and failed to purchase a CD in Plaintiffs' name.[59]  It also alleged that, although the Financing Agreement required return of Plaintiffs'

---

[56]   ECF No. 215, Ex. J.  Presumably, Trojan Productions is, like FilmWest, a film production company, because the email indicates that Trojan "will be sending additional wires in as they register and contract additional films."

[57]   ECF No. 215, Ex. Q at 54.

The next day, Mr. Bellmore *may have* forwarded Trojan's email requesting this transfer to Ms. Brubacher, while indicating to her that "the feared has begun."  ECF No. 216, Ex. A at 11.  The email itself does not appear in the record.  In deposition, Ms. Brubacher *may have* testified that she had "no idea" what Mr. Bellmore's comment meant at the time, and that she did not inquire further about it.  ECF No. 217, Ex. A at 11.  Ms. Brubacher's deposition transcript does not appear in the record.  Whether these events actually happened, however, is irrelevant for purposes of deciding the instant motion.

[58]   ECF No. 215, Ex. S, Hartly Aff., Ex. 3.

[59]   *Id.*

Deposit within 90 days, "Ruby Jacobs recently admitted that such would not be possible, and that a 'few weeks' beyond such deadline would be necessary."[60] Additionally, it noted that, because Solar Wind "so mismanaged [its] relationship with Merrill Lynch . . . that Merrill Lynch . . . has in fact frozen the funds."[61] Finally, it requested "immediate cooperation in effecting termination of all prior agreements, relationships, and transactions between us, including your notification and instruction to Merrill Lynch to immediately release and return our $200,000 deposit."[62]

### K.  New Mexico Action

This letter did not, apparently, effect the return of Plaintiffs' $200,000. Correspondingly, in June 2009, Plaintiffs filed a complaint in a New Mexico state trial court against Solar Wind and Merrill Lynch, seeking return of their Development Deposit.[63]  In its July 1, 2009 answer to this complaint, Merrill Lynch noted that three parties – Plaintiffs, Trojan Productions, and the Jacobses – were asserting competing claims to the funds in the D12 Account.[64]  Merrill Lynch

---

[60]  *Id.*

[61]  *Id.*  In deposition, Merrill Lynch's corporate designee *may have* testified that Solar Wind's "account was frozen on April 17th."  ECF No. 217, Response to Defendants' Statement of Undisputed Facts ¶ 27.  That deposition does not appear in the record.

[62]  ECF No. 215, Ex. S, Hartly Aff., Ex. 3.

[63]  ECF No. 215, Ex. S, Complaint for Injunctive Relief and Writ of Replevin.

[64]  ECF No. 215, Ex. T ¶¶ 34-45.

therefore asserted an interpleader claim against those parties, and sought to deposit the balance of the D12 Account with that court.[65]

The New Mexico court approved that request,[66] and on June 2, 2011, the court signed a "Stipulated Order on Distribution of Interpleader Funds," which allocated the D12 Account balance – $235,478.68 – between the three parties. Plaintiffs' share was $115,239.34.[67]

## L.    Procedural History

Plaintiffs instituted the instant action by filing a complaint on August 17, 2009.[68] The procedural history between that filing and the instant motion is extensive, tortured, and complex, and includes the previously-referenced discovery disputes,[69] several motions to dismiss[70] and previous motions for summary judgment,[71] and a trip to the United States Court of Appeals for the Third Circuit.[72]

Plaintiffs filed their Second (and current) Amended Complaint on March 1, 2012.[73] In it, Plaintiffs alleged multiple counts against the current Defendants as

---

[65]    *Id.* ¶¶ 46-54.

[66]    ECF No. 215, Ex. U.

[67]    *Id.*

[68]    ECF No. 1.  The complaint was filed in the Eastern District in Pennsylvania.

[69]    *See, e.g.*, ECF No. 128.

[70]    *See, e.g.*, ECF Nos. 10, 29, 106, and 170.

[71]    *See, e.g.*, ECF Nos. 32, 139, and 162.

[72]    *See, e.g.*, ECF No. 167.

[73]    ECF No. 122.

well as against Mr. Bellmore, the Jacobses, Solar Wind, and Rio Grande Studios, LLC ("Rio Grande," another entity owned by the Jacobses). At this juncture, it suffices to note that Mr. Bellmore, the Jacobses, Solar Wind, and Rio Grande are no longer parties to this action, and the claims asserted solely against those defendants have been extinguished.

Five outstanding counts remain against Merrill Lynch and Ms. Brubacher: In Count I, Plaintiffs assert violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §1962.[74] Counts II, III, IV, and V allege fraud, conversion, civil conspiracy, and breach of fiduciary duty, respectively.[75] Plaintiffs seek direct and consequential damages, treble damages (under their RICO claim), costs of suit, attorneys' fees, and disgorgement of any earned compensation (under their breach of fiduciary duty claim).

Defendants filed the instant Motion for Summary Judgment on October 3, 2016.[76] In their motion, Defendants argue (1) that Plaintiffs do not have sufficient evidence to prove the requisite elements of their RICO claims,[77] (2) that Plaintiffs

---

[74]  *Id.* ¶¶ 76-85.

[75]  *Id.* ¶¶ 86-109.

[76]  ECF No. 213.  Although labeled "Motion for Summary Judgment," it does not seek judgment in favor of the Defendants on all counts or on all issues.  Therefore, it may more properly be labeled a motion for *partial* summary judgment.

[77]  *Id.* ¶¶ 1-3.

do not have sufficient evidence to prove their breach of fiduciary claim,[78] and (3) that Plaintiffs cannot recover, as a matter of law, any preproduction expenditures incurred in connection with Plaintiffs' efforts to produce the film or any lost profits that Plaintiffs allege the film would have earned had it been produced.[79]

Plaintiffs filed their Opposition to this motion on October 24, 2016.[80] Defendants replied to this Opposition on November 7, 2016.[81]

## II.    DISCUSSION

### A.    Standard of Review

Summary judgment is granted when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[82]   A dispute is "genuine if a reasonable trier-of-fact could find in favor of the non-movant," and "material if it could affect the outcome of the case."[83]   To defeat a motion for summary judgment, then, the nonmoving party must point to evidence in the record that would allow jury to rule in that party's

---

[78]   *Id.* ¶ 4.

[79]   *Id.* ¶¶ 5-7.

[80]   ECF No. 216.

[81]   ECF No. 218.

[82]   Federal Rule of Civil Procedure 56(a).

[83]   *Lichtenstein v. University of Pittsburgh Medical Center*, 691 F.3d 294, 300 (3rd Cir. 2012) (citing *Anderson v. Liberty Lobby*, 477 U.S. 242, 248, 252 (1986).

favor.[84]  When deciding whether to grant summary judgment, a court should draw

all reasonable inferences in favor of the non-moving party.[85]

### B.   Whether Plaintiffs Can Establish a Claim Under 18 U.S.C. § 1962(c)

Section 1962(c) of Title 18 of the United States Code states that

> It shall be unlawful for any person employed by or associated with
> any enterprise engaged in, or the activities of which affect, interstate
> or foreign commerce, to conduct or participate, directly or indirectly,
> in the conduct of such enterprise's affairs through a pattern of
> racketeering activity or collection of unlawful debt.

To prove a violation of this provision, then, a plaintiff must show

> (1) The existence of an enterprise affecting interstate commerce; (2)
> that the defendant was employed by or associated with the enterprise;
> (3) that the defendant participated . . . either directly or indirectly, in
> the conduct or the affairs of the enterprise; and (4) that he or she
> participated through a pattern of racketeering activity.[86]

RICO defines "racketeering activity" to include "any act or threat involving

specified state-law crimes, any act indictable under various specified federal

statutes, and certain federal offenses."[87]  There is no need, however, for a plaintiff

---

[84]   Federal Rule of Civil Procedure 56(c)(1); *Liberty Lobby*, 477 U.S. at 249.

[85]   *Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citation omitted).

[86]   *United States v. Bergrin*, 650 F.3d 257, 265 (3rd Cir. 2011) (quoting *United States v. Irizarry*, 341 F.3d 273, 285 (3rd Cir. 2003). *See also Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 496 (1985) ("A violation of § 1962(c) . . . requires (1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity.").

[87]   *H.J., Inc. v. Northwestern Bell Telephone Co.*, 492 U.S. 229, 232 (1989) (internal quotation marks omitted) (citing 18 U.S.C. § 1961(1)).

to show that a defendant has "already been convicted of a predicate racketeering act."[88]

      The statute also indicates that a "pattern of racketeering activity"

> requires at least two acts of racketeering activity . . . the last of which occurred within ten years (excluding any period of imprisonment) after the commission of a prior act of racketeering activity.[89]

      The Supreme Court has noted, however, that "there is something to a RICO pattern *beyond* simply the number of predicate acts involved."[90]  This is true even if there are more than the required two acts, since "[i]t is not the number of predicates but the relationship that they bear to each other or to some external organizing principle" that matters.[91]  To prove a "pattern of racketeering activity," then, a plaintiff "must show that the racketeering predicates are related, and that they amount to or pose a threat of *continued* criminal activity."[92]  Such "[c]ontinuity is both a closed- and open-ended concept, referring either to a closed period of repeated conduct, or to past conduct that by its nature projects into the future with a threat of repetition."[93]

---

[88]  *Id.* at 236.

[89]  18 U.S.C. § 1961(5).

[90]  *H.J., Inc.*, 492 U.S. at 238.

[91]  *Id.*

[92]  *Id.* at 239 (emphasis added).

[93]  *Id.* at 241.

### 1. Whether Plaintiffs Can Demonstrate "Close-Ended Continuity"

When a case involves an allegation of a "closed period of repeated conduct" – also known as "closed-ended continuity" – the Third Circuit has noted that "duration is the *sine qua non* of [such] continuity," and that such schemes "deal[] with fraudulent conduct lasting *years*, sometimes over a decade."[94] The Third Circuit has also noted that, although there is no "litmus test" for determining when a period of repeated conduct is sufficiently long to constitute a close-ended "pattern" under RICO, "twelve months is not a substantial period of time," and has held that a 1-year-long scheme does not suffice.[95] Plaintiffs and Defendants here agree that if Plaintiffs cannot demonstrate more than a one-year period of racketeering activity, they cannot show "closed-ended continuity."[96]

Plaintiffs have not met their burden here. If Defendants and the Jacobses were involved together in early 2009 in some sort of scheme meant to defraud the Plaintiffs and other hopeful movie producers – which question this Court need not, and does not, decide – Plaintiffs have not produced any evidence from which a jury

---

[94] *Hughes v. Consol-Pennsylvania Coal Co.*, 945 F.2d 594, 611 (3rd Cir. 1991) (emphasis in original) (internal quotation marks and citation omitted).

[95] *Id.* at 611.

[96] ECF No. 214, Defendants' Brief in Support of Motion for Summary Judgment 5-6 ("The Third Circuit has thus held in a long line of unbroken cases that racketeering activity that spans one year or less does not meet RICO's continuity requirement."); ECF No. 216 7-8 ("Thus, for purposes of this motion, the question is not whether the Court is personally convinced of the length of the racketeering, but whether a jury could find more than one year of a 'pattern of racketeering activity.'").

could find that such scheme lasted even one year. Plaintiffs have also not produced any evidence showing what other possible "racketeering activity" Defendants and the Jacobses could have been involved in – or even identified what any other such "racketeering activity" could be.

Upon the facts and evidence presented here, a jury could find that any alleged fraudulent scheme began no earlier than late 2008. Solar Wind opened its D12 Account at Merrill Lynch in December 2008, Mr. Bellmore emailed Ms. Brubacher about Trojan's deposit on January 6, 2009, and on January 7, 2009, Mr. Bellmore *may have* received the "Solar Wind Productions Business Model" and forwarded it to Ms. Brubacher. Even if a jury could infer that some sort of fraudulent scheme took place at this time, it could infer *only* – based on the record evidence – that it began in, say, October or November of 2008, *i.e.* a relatively short period of time before Solar Wind and Merrill Lynch entered into a formal relationship. Although *perhaps* Solar Wind and Merrill Lynch dealt with other aspiring producers before this time, there is simply no evidence produced by Plaintiffs which supports that finding.

Plaintiffs point to a few emails from January 2008 that, according to their "banking expert," "show[] Merrill Lynch's deep involvement in the Jacobs[es]' funds." These emails – *which Plaintiffs' counsel failed to insert into the record* – were exchanged between an officer of Rio Grande (another one of the Jacobses'

entities) and Mr. Bellmore, and contain information and short discussion about the "Seven Cities Entertainment District," a proposed "destination venue project" that the Jacobses were looking to build in Albuquerque, New Mexico.[97] Plaintiffs do not explain, however, how these emails – which discuss a project that does *not* involve the deposit of money by aspiring film producers into Solar Wind's bank accounts – relate to any alleged fraud that resulted in Plaintiffs' lost Development Deposit, and similarly do not explain how these emails, alone, are evidence of any "racketeering activity."

Therefore, even if a jury could find that the events surrounding the April 2009 loss of Plaintiffs' Development Deposit were part of a fraudulent scheme, and that the scheme started some time before Solar Wind first opened the ill-fated D12 Account, a jury could not find, based on the facially innocuous emails of January 2008, either (1) that the April 2009 scheme began as early as January 2008 or (2) that there was some other "racketeering activity" occurring in January 2008.

Next, upon the facts and evidence presented here, a jury could find that any alleged fraudulent scheme continued no later than July 1, 2009, when Merrill Lynch filed its interpleader complaint in the New Mexico trial court. There is no evidence showing that the relationship between Merrill Lynch and the Jacobses continued past that point – making it impossible to find that any alleged fraudulent

---

[97] ECF No. 219.

scheme continued after that time – and Plaintiffs do not allege or offer evidence of any other racketeering activity that Defendants may have participated in past that time.

Plaintiffs attempt to pin May 2010 as an end point for Defendants' "pattern of racketeering activity," because that is when Defendants, in discovery, produced account statements showing that they had satisfied Solar Wind's LMA debt on April 22, 2009, by withdrawing from the D12 Account. However, Plaintiffs point to no evidence showing that Defendants were deliberately withholding this information (even assuming such withholding could constitute "racketeering activity"), and acts of "racketeering activity" do not constitute a "pattern" simply because a plaintiff happens to discover them more than a year after they occurred.

Since a jury could find that any alleged "racketeering activity" participated in by the Defendants occurred no earlier than October 2008 and continued no later than July 2009 – a period of less than one year – Plaintiffs are unable to demonstrate "close-ended continuity," and therefore unable to demonstrate a "pattern of racketeering activity" that way.

## 2. Whether Plaintiffs Can Demonstrate Open-Ended Continuity

When a case involves allegations of "past conduct that by its nature projects into the future with a threat of repetition" – also known as "open-ended continuity" – a plaintiff must "prove [that] the predicate acts [of racketeering activity] are part

of a defendant's regular way of doing business. That is, defendant operates a long-term association that exists for criminal purposes."[98]

Plaintiffs have produced no evidence showing that any alleged fraudulent scheme involving Defendants and the Jacobses was part of Defendants' "regular way of doing business." There is no evidence that anyone at Merrill Lynch besides Mr. Bellmore was involved with the Jacobses, and, in fact, Ms. Hartly admitted in an affidavit that she "was informed that [Mr.] Bellmore had been fired as an employee of Merrill [Lynch] by reason of his and [Solar Wind's] false and unauthorized representations concerning the attachment of Merrill [Lynch] to the [Solar Wind] film financing program."[99] On April 6, 2009, Merrill Lynch sent a letter to Plaintiffs' attorney disavowing any relationship between Merrill Lynch and Solar Wind, and when the competing claims of Plaintiffs and Trojan Productions came to light, Defendants filed for interpleader of the funds in the New Mexico court almost immediately. There is no evidence, then, from which the jury could find that Defendants "operate[d] a long-term association that exist[ed] for criminal purposes" – *i.e.*, a jury could not find "open-ended continuity."

---

[98]    *Hughes*, 945 F.2d at 609-10.

[99]    ECF No. 215, Ex. S, Hartly Aff. ¶ 6.

Because Plaintiffs have not produced evidence sufficient for a jury to find either "closed-ended" or "open-ended" continuity, they are unable to prove that Defendants were engaged in a "pattern of racketeering activity." Therefore, they are unable to sustain their claim under 18 U.S.C. § 1962(c).[100]

## C. Whether Plaintiffs Can Establish a RICO Conspiracy Claim under 18 U.S.C. § 1962(d)

Under 18 U.S.C. § 1962(d), "[i]t shall be unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section." The Third Circuit has held that "[a]ny claim under § 1962(d) based on a conspiracy to violate the other subsections of § 1962 necessarily must fail if the substantive claims are themselves deficient."[101] Because Plaintiffs have failed to sustain their § 1962(c) claim, and because there are no other § 1962 claims outstanding,[102] it follows that they cannot sustain their § 1962(d) claim, either.

---

[100] In their Motion for Summary Judgment, Defendants argued that Plaintiffs are similarly unable about to prove other elements of their 18 U.S.C. § 1962(c) claim. Specifically, they argue that Plaintiffs are unable to prove "[t]he existence of an enterprise affecting interstate commerce" or "that [Defendants] participated, either directly or indirectly, in the conduct or the affairs of the enterprise." *United States v. Bergrin*, 650 F.3d 257, 265 (3rd Cir. 2011). Because the Court has found that Plaintiffs have failed to demonstrate one of the necessary elements of Plaintiffs' § 1962(c) claim, it need not – and does not – determine whether Plaintiffs would be able to demonstrate other necessary elements of that claim.

[101] *Lightning Lube, Inc. v. Witco Corp.*, 4 F.3d 1153, 1191 (3rd Cir. 1993).

[102] Although Plaintiffs' Second Amended Complaint contains a claim under § 1962(a), this Court previously dismissed that claim (as it appeared in Plaintiffs First Amended Complaint, ECF No. 94) in an Order dated October 31, 2011. ECF No. 112. Although Plaintiffs successfully moved this Court to reconsider parts of that Order, see ECF Nos. 115 and 121, Plaintiffs did not ask this Court to reconsider its dismissal of the § 1962(a) claim, nor did this Court grant Plaintiffs leave to raise that claim in an amended complaint.

**D. Whether Plaintiffs Can Establish Damages in the Form of Lost Profits**

Under Pennsylvania law, "a claim for damages must be supported by a reasonable basis for calculation; mere guess or speculation is not enough."[103] When a plaintiff seeks damages in the form of lost profits, there must be both "evidence to establish them with reasonable certainty" and "evidence to show that they were the proximate consequence of the [defendant's] wrong."[104] Courts are generally "reluctant to award" such damages, "except when the business concerned is established and not new and untried."[105] Lost profits "cannot be recovered where they are merely speculative," and "when a business is new and untried, courts have declared the measure of anticipated profits too speculative to provide a basis for an award of damages."[106]

Plaintiffs have produced no evidence tending to establish, with any "reasonable certainty," the lost profits they allegedly would have earned but for Defendants' conduct. To prevail on this claim for damages, it seems that Plaintiffs would have to prove *at least* (1) that Defendants' actions caused Plaintiffs' failure to obtained the promised funding, (2) that, with the funding promised by Solar Wind, Plaintiffs would have been able to produce their film, (3) that Plaintiffs

---

[103] *Stevenson v. Economy Bank of Ambridge*, 413 Pa. 442, 454 (1964).

[104] *Delahanty v. First Pennsylvania Bank, N.A.*, 318 Pa.Super. 90, 120 (1983).

[105] *Id.* (internal quotation marks omitted).

[106] *Id.* at 120-21 (internal citations omitted).

*would have* produced their film, (4) that Plaintiffs' completed film would have found a commercial outlet, (5) that Plaintiffs' completed film, once established in that commercial outlet, would have earned money, (6) that the money earned by Plaintiffs' completed film in that commercial outlet would have been in excess of the amount spent producing the film.

There is virtually no evidence to support any of these elements. Plaintiffs point to a "distribution deal" with an entity called "Echo Bridge," which they claim provided a projection of "domestic and foreign sales"[107] in the amount of $14,043,430.[108] Plaintiffs, however, *have failed to enter this projection into the record*. There is no explanation of how Echo Bridge calculated that amount, so therefore there is no indication of whether such calculation itself would be admissible in evidence or excluded as irrelevant, unreliable, or speculative.

In any event, even *were* this projection of Echo Bridge entered into the record, Plaintiffs would still be standing on ground too weak to support their claim for lost profits. Plaintiffs' anticipated film was not an "established" business; it was a "new and untried" project based on a screenplay by a relatively inexperienced writer with no previous film writing credits to her name.[109] In

---

[107] ECF No. 215, Ex. B at 62.

[108] ECF No. 215, Ex. W at 2-3.

[109] *See* ECF No. 215, Ex. B at 7-8 (Ms. Metcalf admitting that she had written "[m]aybe three or four" other screenplays," none of which had been "produced in any fashion").

deposition, Ms. Metcalf admitted that "even if everything had gone as [she] expected it to go, [the] film might not make money,"[110] and Ms. Hartly conceded that "even if [the] movie were made, it doesn't mean that [we] were going to get all or most of [our money] back."[111]

Plaintiffs' claim for damages in the form of lost profits, then, cannot be sustained, and is therefore denied.

### E. Whether Plaintiffs Can Establish Damages in the Form of Lost Pre-Production Expenses

Under Pennsylvania law, "[t]he victim of a misrepresentation is entitled to all pecuniary losses which result from his *reliance* on the misrepresentations."[112] Such reliance damages are available even in claims of conversion – where the default rule is the "value of the converted property at the time of the conversion" – because the "court's over-arching task . . is to compensate the plaintiff for the defendant's wrong," which compensation includes "all actual losses or injuries sustained as a natural and proximate result of the [defendant's] wrong."[113]

Here, Plaintiffs have produced sufficient evidence for a jury to find that they expended money to produce their film in reliance on promises of further funding

---

[110] *Id.* at 204.

[111] ECF No. 215, Ex. G at 623.

[112] *Fort Washington Resources, Inc. v. Tannen*, 858 F.Supp. 455, 461 (E.D. Pa. 1994) (emphasis added).

[113] *Fort Washington Resources, Inc. v. Tannen*, 901 F.Supp. 932, 944 (E.D. Pa. 1995) (internal quotation marks and citations omitted).

for that film. Ms. Hartly and Ms. Metcalf both testified about these issues in their respective depositions,[114] and the record contains a document detailing $372,872 of these expenses.[115] In their motion for summary judgment, Defendants argue that these expenses should not be recoverable because Plaintiffs would have recovered them only if the film was made and was profitable.[116] Defendants conflate the concept of lost profits with reliance damages: the former reflect what a plaintiff allegedly would have made in the future, but for defendant's wrongful actions, and the latter reflect what a plaintiff actually has spent in the past, in reliance on defendant's wrongful actions.

Plaintiffs' claim for damages in the form of pre-production expenses, then, can be sustained.

## F. Whether Plaintiffs Can Establish the Existence of a Fiduciary Relationship Between Them and the Defendants

Under Pennsylvania law, a fiduciary relationship is "characterized by overmastering influence on one side or weakness, dependence, or trust, justifiably reposed, on the other side."[117] The relationship between a broker and his client is a

---

[114] ECF No. 215, Ex. B at 239-40, Ex. G at 360.

[115] ECF No. 215, Ex. X.

[116] ECF No. 214 at 15 n.4.

[117] *eToll, Inc. v. Elias/Savion Advertising, Inc.*, 811 A.2d 10, 23 (Pa. Super. Ct. 2002).

fiduciary relationship that imposes certain obligations on the broker vis-à-vis his client.[118]

Here, Defendants argue that no fiduciary relationship existed between Plaintiffs and Defendants because Defendants never actually opened the subaccount for which Plaintiffs applied. While it is true that the opening of such an account would have created a fiduciary relationship, the law in this area is not so formalistic as to prohibit the formation of such a relationship based merely upon Defendant's failure to accept Plaintiffs' account application. The record reveals a number of interactions between Mr. Bellmore, acting as Merrill Lynch's agent, and Plaintiffs regarding the steps needed to set up Plaintiffs' subaccount. And Ms. Metcalf testified in deposition that she felt a "sense of relief" and "didn't have to worry" about her money when she learned that Merrill Lynch was the firm selected to hold her money.[119] From these facts, a jury could find that the Plaintiffs "justifiably reposed" trust in the Defendants – *i.e.* that a fiduciary relationship existed between them.

Plaintiffs' claim for breach of fiduciary duty, then, can be sustained.

---

[118] *Merrill Lynch, Pierce, Fenner & Smith v. Perelle*, 356 Pa.Super. 165, 183 (1986).

[119] ECF No. 215, Ex. B at 90, 132.

## III.    CONCLUSION

Plaintiffs have not produced sufficient evidence to allow a jury to find in their favor on their RICO claims under 18 U.S.C. § 1962; therefore, judgment is entered in favor of Defendants on Count I of Plaintiffs' complaint.  Plaintiffs also have not produced sufficient evidence to allow a jury to award damages allegedly stemming from lost profits on their film; Plaintiffs' demand for these damages, then, is denied.

Plaintiffs have, however, produced sufficient evidence to allow a jury to award damages in the form of lost pre-production expenses, and to find that a fiduciary relationship existed between them and the Defendants.

An appropriate Order follows.

BY THE COURT:


*s/ Matthew W. Brann*
Matthew W. Brann
United States District Judge