# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| LINDA METCALF, et al., | No. 4:11-CV-00127 |
| Plaintiffs, | (Judge Brann) |
| v. | |
| MERRILL LYNCH, PIERCE, FENNER & SMITH, Inc., et al., | |
| Defendants. | |

## MEMORANDUM OPINION

### AUGUST 1, 2019

Defendants moved to preclude Plaintiffs from seeking punitive damages at the upcoming (but as-yet unscheduled) jury trial in the above-captioned case. That motion will be denied.

## I.   BACKGROUND

This Court provided a detailed explanation of the facts underlying this case in its October 10, 2017 Memorandum Opinion.[1]  A short refresher of the relevant cast of characters is therefore sufficient.

Solar Wind Productions ("SWP") was a film production company in New Mexico.  Michael Jacobs and Ruby Handler-Jacobs were SWP's principals, and John Galen Davis was its CFO.

---

[1]   ECF No. 220.

SWP offered a program designed to help independent film producers obtain the funding needed to produce their films. There were three main steps to this program. First, the producer would deposit 10% of their film's budget into a brokerage account. The producer and SWP would be co-signatories on the account. Second, the deposit would be converted to a certificate of deposit. And third, a line of credit would be obtained using the CD as collateral, which line of credit would (somehow) be used "to obtain total film financing."[2]

SWP utilized Merrill Lynch, Pierce, Fenner & Smith, Inc. ("Merrill Lynch") as its brokerage firm in connection with its film financing program. Its financial advisor there was Larry Bellmore. Mr. Bellmore's immediate advisor was Terri Fought. Also above Mr. Bellmore in the corporate structure were Robin Brubacher, a client relationship manager, and Alvin Walton, an administrative manager.

Linda Metcalf is a California-based writer; Michelle Hartley a California-based producer. Ms. Metcalf and Ms. Hartley teamed up in 2008 to work on one of Ms. Metcalf's film projects. In early 2009, the two women contracted with the Jacobses to use SWP's film financing program.

---

[2] *See* Solar Wind Productions Film Fund Financing Program Summary (ECF No. 272-2, Ex. 2) at 1.

A.    Merrill Lynch's Knowledge of, and Involvement with, SWP's Film Financing Program

From the beginning, Merrill Lynch was aware of SWP's business plan, and saw itself as playing some active role in SWP's film financing program.[3]

On December 26, 2008, Mr. Bellmore told Mr. Davis that, "[w]hen the [producers'] accounts are opened with Merrill, I need to make sure they correspond with the financing agreement, the producers' expectations, and your . . . expectations."[4] Mr. Bellmore noted his desire to "make sure [he] ha[d] the accounts established properly," since he didn't "want future issues with the producers."[5]

On December 31, 2008, Mr. Bellmore emailed Mr. Davis to tell him that a deposit from Trojan Productions, Inc., one of SWP's producer-clients, had arrived in SWP's brokerage account, and that the deposit was being held there while Trojan's subaccount application was "pending."[6] In that same email, Mr. Bellmore stated that, in order for SWP "to obtain the earlier commitment of [other] producer[s]," he "would suggest all funds be wired to SWP and then transferred to the [producer's] sub account once [the sub account] is opened."[7]  Mr. Bellmore

---

[3]    *See, e.g.*, December 9, 2008 email from Mr. Bellmore to Ms. Fought (ECF No. 272-2, Ex. 3) (discussing a call Mr. Bellmore had with the Jacobses about a potential new producer for SWP's film financing program, and noting that SWP's "transaction [with that producer] was agreed to and contract language adjusted to the terms and conditions finalized").

[4]    December 26, 2008 email from Mr. Bellmore to Mr. Davis (ECF No. 272-2, Ex. 7).

[5]    *Id.*

[6]    December 31, 2008 email from Mr. Bellmore to Mr. Davis (ECF No. 272-2, Ex. 12).

[7]    *Id.*

recognized, however, that this might not be "preferable" to some producers, in which case "wiring of funds will have to wait until Merrill approves the sub account."[8]

On January 7, 2009, Mr. Bellmore emailed SWP's "Business Model" to Ms. Fought and Ms. Brubacher.[9]  This "Business Model" indicated: (1) that "separate accounts will be opened for each [producer] for segregation of [the producer's] [d]eposit"; (2) that the subaccounts will be "established in the joint names of Solar Wind Productions and the [p]roducer[] . . . for the holding of the . . . [d]eposit"; (3) that producers' deposits "are [first] going to be received in" SWP's brokerage account; and (4) that the . . . [d]eposits will [then] be moved to the [sub] [a]ccounts."[10]

### B.    Merrill Lynch's Recognition of the Risks Inherent in SWP's Film Financing Program

Also from the beginning, Merrill Lynch acknowledged that SWP's program created risks for itself and for SWP's clients.

On December 26, 2008, Mr. Bellmore scheduled a conference call with SWP to "discuss legal language of documents and the liability it creates for Merrill [Lynch] and others . . . [and] to make sure that the documents, the process, the

---

[8]   *Id.*

[9]   January 7, 2009 email from Mr. Bellmore to Ms. Brubacher and Ms. Fought (ECF No. 272-2, Ex. 14).

[10]   *Id.*

liabilities were clear, protected, and understood by all."[11]  At that time, Mr. Bellmore was candid about the "internal issues with Merrill [Lynch] that have been raised here . . . as a result of reviewing the process."[12]  In fact, Merrill Lynch was "in compliance review because of the nature and structure of the business—frequency of expected wires, expected and existing 3rd party wire transfers to [SWP], . . . [and] authorized representatives and clients."[13]

A short while later,[14] Mr. Bellmore emailed Mr. Walton and Ms. Fought to tell them that SWP's "final production financing contract should be here today."[15] Recognizing that the producers' deposits would be pledged against a line of credit,[16] Mr. Bellmore stated that he wanted to review the contract to "know whether the [producer's] deposit[s] [were] at risk," since he "want[ed] the business, but

---

[11] December 26, 2008 email from Mr. Bellmore to Mr. Davis (ECF No. 272-2, Ex. 8).

[12] December 26, 2008 email from Mr. Bellmore to Mr. Davis (ECF No. 272-2, Ex. 7); *see also* December 30, 2008 email from Mr. Bellmore to SWP's attorney (ECF No. 272-2, Ex. 10) ("If I no longer trust the process, I will withdraw Merrill.").

[13] December 31, 2008 email from Mr. Bellmore to Mr. Davis (ECF No. 272-2, Ex. 12).

[14] Although this email is undated, Merrill Lynch characterizes it as sent "several weeks" after the December 9, 2008 email, and Plaintiffs do not dispute that assertion.  Defendant's Brief in Support (ECF No. 273) at 5.

[15] Undated email from Mr. Bellmore to Mr. Walton and Ms. Fought (ECF No. 272-2, Ex. 4).

[16] *Id.* (noting that the producers "may very well receive their production financing based upon the assets being pledged"); *see also* February 13, 2009 email from Mr. Bellmore to Ms. Fought and Stanley Miska (ECF No. 272-2, Ex. 5) (noting that Trojan "left . . . funds at Merrill to facilitate the transfer" of those funds to SWP's Merrill Lynch account); *id.* ("There are 2 other films that should fund next week for a total of $3-$4 Million in deposits for this week and next. . . .  The Producer's deposits are used to secure an LMA for operations of the operations of Solar Wind[].").

obviously not the legal problems if there is liability."[17]  Perhaps to assuage Mr. Walton's and Ms. Fought's concerns, Mr. Bellmore also mentioned that, "based upon [his] last understanding[,] the [sub] account[s] require[] the producer[s'] signature[,] [s]o[] only transactions approved by the producers . . . will be executed from the [their] deposit."[18]

On January 9, 2009, in an email to Mr. Jacobs discussing SWP's wire transfer requests, Mr. Bellmore conceded that "[t]here is concern in compliance about the process of this transaction . . . [m]oney wired in from 3rd parties in different locations and then wired out to other third parties in other locations . . . [t]he manner in which business is being transacted appears to be the pattern of money launderers."[19]

### C.    Trouble Brewing with Trojan Productions

As noted above, by December 31, 2008, Trojan Productions had wired $250,000 to SWP's Merrill Lynch account.[20]  On January 20, 2009, SWP used $200,000 of that money to purchase a 90-day CD,[21] which CD was pledged against

---

[17]    Undated email from Mr. Bellmore to Mr. Walton and Ms. Fought (ECF No. 272-2, Ex. 4).

[18]    *Id.*

[19]    January 9, 2009 email from Mr. Bellmore to Mr. Jacobs (ECF No. 276-1, Ex. 11).

[20]    December 30, 2008 Wire Transfer Confirmation from U.S. Bank to Trojan Productions, Inc. (ECF No. 276-1, Ex. 8).

[21]    January 2009 statement for SWP's Merrill Lynch account (ECF No. 276-1, Ex. 9).  It is unclear why only $200,000 of Trojan's deposit—and not the full $250,000—since Trojan's contract with SWP called for the full amount of the deposit to be "directly converted into a Certificate

a line of credit in SWP's name.[22]   On February 11, 2009, the Jacobses told Mr.

Bellmore to move the $200,000 CD from its account to Trojan's sub account.[23]   That

request was never honored.

On March 2, 2009, Mr. Bellmore—apparently in response to an inquiry from

Trojan—wrote a letter to Trojan explaining that:

> Solar Wind[] has a $200,000 CD in their account and $50,000 in their
> line of credit which they have pledged to you. . . I will work on moving
> the funds and the CD into Trojan Productions' account.  I may have a
> short delay in moving the CD.  I will explain if that occurs.  The cash
> will be moved into your account as soon as I am able to do so.[24]

That same day, Mr. Bellmore sent an email to the Jacobses coaching them on how

to deal with Trojan.[25]   Recognizing that it was "not for [him] to direct the [deposit]

or reference the contract" in his communication with Trojan, Mr. Bellmore told the

Jacobses to tell Trojan that:

> Per your contract with Solar Wind[] Productions, The Trojan
> Productions production deposit is/was pledged to the Solar Wind
> Production LLC [line of credit].  The production deposit will be moved

---

of Deposit."  December 24, 2008 Financing Agreement between SWP and Trojan (ECF No.
276-1, Ex. 6).

[22]   January 2009 statement for SWP's Merrill Lynch accounts (ECF No. 276-1, Ex. 9).

[23]   February 11, 2009 fax from the Jacobses to Mr. Bellmore (ECF No. 276-1, Ex. 16).

[24]   March 2, 2009 letter from Mr. Bellmore to Trojan Productions (ECF No. 276-1, Ex. 24).

[25]   March 2, 2009 email from Mr. Bellmore to the Jacobses (ECF No. 276-1, Ex. 7).

to your Trojan Productions, Inc. account but it will still be pledged to the [line of credit] per your contract with Solar Wind Productions.[26]

The next day, March 3, 2009, Trojan copied Mr. Bellmore on an email sent to SWP.[27] The email indicated that Trojan "ha[d] a lot of issues," including "[n]ot knowing what's going on" despite all that "was said and promised."[28] It noted that its "money was there in [Merrill Lynch] on 12/30/08" and "at [SWP's] disposal," and that Trojan "now need[ed] to know more."[29] Finally, it requested that SWP and its "team, legal and otherwise, call [Trojan] tomorrow" to bring it "up to par."[30]

## D. The First Freeze

While problems with Trojan were brewing, SWP was experiencing some corporate palace intrigue.

On March 1, 2009, the Jacobses told Mr. Bellmore that Mr. Davis had been removed as CFO of Solar Wind, and asked Mr. Bellmore to remove Mr. Davis as an authorized signer on SWP's Merrill Lynch accounts.[31] The next day, however, Ms. Handler-Jacobs reversed course, telling Mr. Bellmore that SWP "ha[d] decided to

---

[26] *Id.*

[27] March 3, 2009 email from Trojan to Mr. Davis, the Jacboses, and Mr. Bellmore (ECF No. 276-1, Ex. 25).

[28] *Id.*

[29] *Id.*

[30] *Id.*

[31] March 1, 2009 letter from the Jacobses to Mr. Bellmore (ECF No. 272-2, Ex. 15) (noting problems between the Jacobses and Mr. Davis and that, as of February 28, 2009, Mr. Davis "no longer ha[s] any authority to act as . . . CFO . . . and [is] no longer [an] authorized signer[] on all our . . . . accounts at Merrill Lynch.").

give [Mr. Davis] one more week to complete some tasks as the acting CFO," and to "please disregard the [previous] letter removing [Mr. Davis's] authorities" on the Merrill Lynch Accounts.[32]   Alarmed by these developments, Merrill Lynch temporarily froze SWP's account.[33]

### E.   Ms. Metcalf's Application

In the middle of March 2009—around the time the first freeze was instituted— Mr. Bellmore had been communicating with Ms. Metcalf about the SWP film financing program and what steps Ms. Metcalf needed to take to set up her account at Merrill Lynch.

In a March 16, 2009 email, Mr. Bellmore sent Ms. Metcalf an application to open a brokerage account.[34]   Mr. Bellmore noted the application was sent at the Jacobses' request, and asked Ms. Metcalf to "[p]lease call me to complete the

---

[32]   March 2, 2009 email from Ms. Handler-Jacobs to Mr. Bellmore (ECF No. 272-2, Ex. 16) ("We have decided to give [Mr. Davis] one more week to complete some tasks as the acting CFO with the authorities he had.  So for now, please disregard the . . . letter removing [Mr. Davis's] authorities.").

[33]   March 16, 2009 email from Mr. Bellmore to Mr. Davis and the Jacobses (ECF No. 272-2, Ex. 19) ("There is an account review in progress for [your Merrill Lynch accounts].  In the meantime, Merrill is unable to provide 3rd party services such as checking, wires out, ACH or Debit Card transactions.  We will notify you as soon as the review is completed."); Deposition of Martin (ECF No. 272-2, Ex. 18) ("I believe in March the Solar Wind accounts were frozen because of . . . disputes with the can I call them the CFO of the accounts, the one in charge of handling the money, and the corporate resolutions and who was supposed to be doing what as far as the resolutions were, and I think that was like early March and it created some issues with Solar.")

[34]   March 16, 2009 email from Mr. Bellmore to Ms. Metcalf (ECF No. 215, Ex. P).

documents for your Merrill account."[35]  Ms. Metcalf sent her completed application

back the same day.[36]  Late in the evening on March 16, 2009, Mr. Bellmore—once

again displaying his intimate knowledge of SWP's film financing program—sent

another email to Ms. Metcalf and others, stating:

> The contract calls for wiring funds to the Solar Wind Account and
> having 2 signatures on the account for the protection of the producer.
> That cannot be accomplished as it then gives Linda authority over other
> client accounts and assets beyond the CD in the Solar Wind account
> and other sub accounts.
>
> Therefore, I setup the sub account for wiring funds directly to it.  For
> the moment, Linda Metcalf is the only signature on the account and will
> be on control of the funds.  Once the account is established we can add
> the CFO as the other signature on the sub-account and require two
> signatures from that point out.
>
> If you have any questions as to the structure and how it works, call me.
> (Mr. Bellmore then provided his direct phone number at Merrill Lynch
> and his cell phone number.)[37]

Mr. Bellmore and Ms. Metcalf continued their discussion about opening a Merrill

Lynch account in a string of emails sent March 17 and 18, 2009.[38]

### F.    Mr. Bellmore's Attempts to Unfreeze SWP's Account

Because Mr. Bellmore understood the logistics of SWP's film financing

program, he also understood that a freeze on SWP's accounts would curtail SWP's

---

[35]  *Id.*

[36]  March 16, 2009 fax from Ms. Metcalf to Mr. Bellmore (ECF No. 215, Ex. R).

[37]  March 16, 2009 email from Mr. Bellmore to Ms. Hartly, Ms. Metcalf, and the Jacobses (ECF No. 276-1, Ex. 5).

[38]  March 17 and 18, 2009 email chain between Ms. Metcalf and Mr. Bellmore (ECF No. 272-2, Ex. 21).

ability to conduct business. Therefore, while discussions with Ms. Metcalf were occurring, he stressed the need to unfreeze SWP's account to his superiors.

In a March 17, 2009 email to Ms. Brubacher and Ms. Fought, he noted that the Jacobses "have movies which want to wire in now," and that the freeze would "put them out of business if they can't setup accounts and fund operations."[39] On March 18, 2009, Mr. Bellmore emailed Ms. Brubacher about Ms. Metcalf's application and emphasized that "[w]e need to open this account and hold the funds until we have resolved the issues else [SWP] may lose this opportunity."[40] A March 19, 2009 email sent on Mr. Bellmore's behalf to Ms. Brubacher noted that Ms. Metcalf was "requesting wiring inst[ructions] to wire . . . [her] funds into [Merrill Lynch]," which funds would "just go into the money market until the other matters with Solar Wind[] are settled."[41] That email warned, however, that "if we decide that we cannot open [Ms. Metcalf's] account soon [she] may go elsewhere," and queried whether there was "any way to approve [her] acc[ount] at this time."[42] And in a March 23, 2009 email, Mr. Bellmore noted that Ms. Metcalf "ha[d] $200[,000] being held for wire transfer" and that Merrill Lynch "need[s] to allow this account

---

[39] March 17, 2009 email from Mr. Bellmore to Ms. Brubacher and Ms. Fought (ECF No. 272-2, Ex. 17).

[40] March 18, 2009 email from Mr. Bellmore to Ms. Brubacher and outside counsel (ECF No. 272-2, Ex. 21).

[41] March 19, 2009 email from Christine DeVito to Stanley Miska (ECF No. 272-2, Ex. 22).

[42] *Id.*

to be opened and documentation for the pledge to the LMA to begin or [SWP] could lose this account."[43]

SWP's account was apparently unfrozen on March 27, 2009.[44]

G.    Change of Procedures and Ms. Metcalf's Deposit

At some point along the way, someone decided that—despite previous representations and the contractual requirements between SWP and its producers—the producers would no longer have any authority over their sub accounts at Merrill Lynch.

On March 25, 2009, Mr. Bellmore sent an email to Ms. Brubacher bearing the subject line "Solar Wind Productions Revised Procedures."[45]   Under the heading "General Procedures for Account Opening of Solar Wind [Sub] Accounts," the email noted:  (1) that the sub accounts would be "opened with Solar Wind['s] Tax ID"; (2) that the sub accounts "c[an] have [the] name of the [proposed] film incorporated [into the] account name"; (3) that "[m]anagers of [the] [s]ub[]account must be the same as the [m]embers of Solar Wind"; and (4) that "[t]here must be common control of the [s]ub[ account] and the Solar Wind[] [m]ain account."[46]

---

[43]   March 23, 2009 email from Mr. Bellmore to Ms. Brubacher (ECF No. 272-2, Ex. 23).

[44]   *See* March 26, 2009 email from Lisa Condon to William Goydan (ECF No. 276-1, Ex. 22) (complaining about freeze); Checks dated March 27, 2009 from SWP's account (ECF No. 276-1, Ex. 23).

[45]   March 25, 2009 email from Larry Bellmore to Ms. Brubacher (ECF No. 272-2, Ex. 24).

[46]   *Id.*

Solar Wind apparently agreed to this new setup on March 30, 2009.[47] It is unclear, however, whether Ms. Metcalf was informed of this change. Arguably, she would have found the new information alarming, since—as noted in this Court's earlier Memorandum Opinion—she testified that "the $200,000 [deposit] was supposed to be in my sole control."[48] Nevertheless, Mr. Bellmore continued to facilitate Ms. Metcalf's business relationship with SWP.

On March 30, 2009—the same day SWP agreed to the new procedures giving it sole authority over the sub accounts—Mr. Bellmore told Ms. Fought that Ms. Metcalf was "having a bank check issued and [was] bringing [it] to a Merrill branch and depositing it in the Solar Wind[] account."[49] Two days later—April 1, 2009—Ms. Metcalf purchased a cashier's check made out to SWP and deposited it into SWP's account at a Merrill Lynch branch in Escondido, California.[50] At noon that day, Ms. Metcalf emailed Mr. Bellmore, told him about the deposit, and asked for "verification of [her] sub-account and purchase of CD."[51]

---

[47] *See* March 30, 2009 email from Mr. Bellmore to Ms. Fought (ECF No. 272-2, Ex. 25) ("Solar Wind[] Productions has agreed to the following for each film: Open . . . [s]ub [a]ccounts in Solar Wind Production Tax ID with separate name for each film.").

[48] October 10, 2017 Memorandum Opinion (ECF No. 220) at 12-13.

[49] March 30, 2009 email from Mr. Bellmore to Ms. Fought (ECF No. 272-2, Ex. 25).

[50] April 1, 2009 email from Ms. Metcalf to the Jacobses and Mr. Bellmore (ECF No. 272-2, Ex. 26); October 10, 2017 Memorandum Opinion (ECF No. 220) at 13.

[51] ECF No. 272-2, Ex. 26.

H.    Trouble Erupts from Trojan Productions—"The Feared Has Begun"

While negotiating new procedures for opening brokerage accounts at Merrill Lynch for the SWP film financing program, and while continuing to facilitate Ms. Metcalf's business relationship with SWP, Mr. Bellmore remained in contact with Trojan Productions about its deposit. And Trojan was not happy.

On March 25, 2009, apparently responding to an inquiry by Trojan about its deposit, Mr. Bellmore stated in an email that he was "[w]orking on the process," and that "it involves more than just your account."[52] The next day, March 26, 2009, Trojan wrote back stating that it was "getting very worried" because its "money was never in [its] own account" even though it "sent it to be in [its] own account."[53] It implored Mr. Bellmore to "let [it] know that [the] money is safe."[54]

Late in the afternoon on April 1, 2009—the same day Ms. Metcalf made her deposit—Trojan's attorney emailed Mr. Bellmore about Trojan's deposit, demanding an accounting of Trojan's funds.[55] At 6:30am the next morning—April 2, 2009—Mr. Bellmore forwarded that email to Ms. Brubacher, commenting that "The feared has begun."[56]

---

[52]    March 25, 2009 email from Mr. Bellmore to Alex Kazan (ECF No. 276-1, Ex. 28).

[53]    March 26, 2009 email from Alex Kazan to Mr. Bellmore (ECF No. 276-1, Ex. 28).

[54]    *Id.*

[55]    April 1, 2009 email from Paul T. Gough to Mr. Bellmore (ECF No. 276-1, Ex. 26).

[56]    April 2, 2009 email from Mr. Bellmore to Ms. Brubacher (ECF No. 276-1, Ex. 27).

Mr. Bellmore apparently spoke with Trojan's attorney sometime later that day in an attempt to clarify the situation.[57] The conversation presumably did not assuage Trojan's concerns, however, because Trojan's attorney immediately sent Mr. Bellmore an email indicating that Trojan had terminated its agreement with SWP and demanding that Trojan's deposit "be frozen . . . until this matter is resolved as it appears that [Trojan's] funds are in the Solar Wind Productions LLC account instead of where they belong, which is in the Trojan Productions, Inc. account."[58]

I.      Ms. Metcalf's (?) Account is Opened

On April 6, 2009, Mr. Bellmore initialed a document approving a sub account to SWP's main brokerage account.[59] That same day, Ms. Fought—presumably in reference to this document—sent an email to Ms. Brubacher, asking her to "please review this new account for Solar Wind[]," indicating that "[w]e need to [move] $200,000 over from the main account upon opening."[60] Ms. Brubacher signed the document on April 15, 2009.[61] The next day, April 16, 2009, Mr. Bellmore told Ms. Fought and Mr. Walton that Merrill Lynch needed to move Ms. Metcalf's deposit to

---

[57] *See* April 2, 2009 email from Paul Gough to Mr. Bellmore (ECF No. 276-1, Ex. 26) ("I am disappointed that you have declined to respond to my inquiries about the whereabouts of [Trojan's] $250,000 other than to advise that my client's account is [not where the deposit was wired].").

[58] *Id.*

[59] BIAWCMPF document (ECF No. 276-1, Ex. 30).

[60] April 6, 2009 email from Ms. Fought to Ms. Brubacher (ECF No. 276-1, Ex. 29).

[61] April 15, 2009 Account Opening Documents (ECF No. 276-1, Ex. 30).

the new account and buy a 90-day CD with it.[62]  SWP reiterated that request on April 17, 2009.[63]

There was one small problem, however.  Although Ms. Metcalf applied for—and was promised, both by SWP and Mr. Bellmore—an account under her control, the document approving the new sub account was in SWP's name, and solely under SWP's control.[64]

### J.     The Second Freeze—Merrill Lynch Fires Mr. Bellmore and Pays Itself

On April 17, 2009, a Trojan Productions investor called Merrill Lynch claiming that some of the funds in SWP's account belonged to her and inquiring about the funds' whereabouts.[65]  This call prompted Merrill Lynch to immediately freeze SWP's account.[66]

---

[62]  April 16, 2009 email from Mr. Bellmore to Ms. Fought and Mr. Walton (ECF No. 276-1, Ex. 31).

[63]  April 17, 2009 fax from the Jacobses to Mr. Bellmore (ECF No. 276-1, Ex. 31).

[64]  *Compare* March 16, 2009 application completed by Ms. Metcalf (ECF No. 215, Ex. R) *with* BIAWCMPF document (ECF No. 276-1, Ex. 30).  The only reference to Ms. Metcalf on the document approving the new sub account was the fact that the title of Ms. Metcalf's proposed film was worked into the "business name" provided for the new sub account.

[65]  June 1, 2009 letter (ECF No. 276-1, Ex. 35).

[66]  June 1, 2009 letter (ECF No. 276-1, Ex. 35).  The April 17, 2009 date comes from a letter sent by Merrill Lynch's outside counsel to FINRA on June 1, 2009 (ECF No. 276-1, Ex. 35).  A handwritten memo by Mr. Walton, however, indicates that the SWP account was frozen the day before—on April 16, 2009.  *See* April 16, 2009 handwritten memo of Mr. Walton (ECF No. 276-1, Ex. 36) (noting that Mr. Walton had spoken to Ms. Handler-Jacobs and told her that Merrill Lynch was "closing the accounts due to the inquiries" because it "d[id] not want to be in the middle").  The April 16, 2009 date is arguably worse for Merrill Lynch's case, because it shows that Merrill Lynch made the decision to freeze SWP's account before receiving the April 17, 2009 inquiry from the Trojan investor—i.e., it shows that Merrill Lynch was willing to freeze SWP's accounts on the basis of Trojan's earlier complaints alone,

A flurry of activity followed this second freeze. In an April 18, 2009 memo, Mr. Bellmore noted that transfer of Ms. Metcalf's deposit was "[b]locked and [w]ire reversed"—i.e., that the deposit was to be "wired back to [the] producer."[67] In an April 19, 2009 fax, SWP asked Mr. Bellmore to (1) liquidate the 90-day CD in its brokerage account that had been purchased with Trojan's deposit; (2) pay off the line of credit; and (3) wire the remaining funds to its savings account at Bank of America.[68] SWP made it clear in this fax that it was making these requests as a result of Merrill Lynch's decision to "terminat[e] our relationship."[69] And in an April 20, 2009 email to Mr. Bellmore, Ms. Hartly expressed displeasure that, "[c]ontrary to [our] contract [with] Solar Wind . . . in which you are referred to as the Financial Advisor," Ms. Metcalf's deposit was not "placed in a dual signature account." Correspondingly, Ms. Hartly asked Mr. Bellmore to "return the money in full" or to "freeze the account until this matter can be resolved."[70]

Merrill Lynch terminated Mr. Bellmore on April 21, 2009 for "violat[ing] various firm policies by . . . allowing different client funds to be comingled[ and by]

---

complaints which had been received weeks earlier, while Mr. Bellmore continued to work with Ms. Metcalf to secure her deposit.

[67] April 18, 2009 email from Mr. Bellmore to himself (ECF No. 276-1, Ex. 34).

[68] April 19, 2009 fax from the Jacobses to Mr. Bellmore (ECF No. 276-1, Ex. 37).

[69] April 19, 2009 fax from the Jacobses to Mr. Bellmore (ECF No. 276-1, Ex. 37); *see also* April 24, 2009 fax from the Jacobses to Ms. Fought and Ms. Brubacher (ECF No. 276-1, Ex. 38).

[70] April 20, 2009 email from Ms. Hartly to Mr. Bellmore (ECF NO. 276-1, Ex. 41).

providing legal advice to a client."[71]  The next day, April 22, 2009, Merrill Lynch (1) liquidated the 90-day CD that had been purchased with Trojan's deposit; (2) poured that CD's funds back into SWP's brokerage account, mixing them with the funds from Ms. Metcalf's deposit; and (3) paid off SWP's line of credit with the amalgamated funds.[72]

After this self-payoff, the balance in SWP's account was $235,478.68.[73] Merrill Lynch interpleaded these funds in a New Mexico state court, where Trojan, the Jacobses, and Ms. Metcalf made claims on it.[74]  Ms. Metcalf walked away from that action with $115,239.34—i.e., a $84,760.66 loss.[75]

K.     Procedural History

This suit followed.  Plaintiffs have four claims remaining against Defendants: (1) a fraud claim; (2) a conversion claim; and (3) a civil conspiracy claim; and (4) a breach of fiduciary duty claim.  On June 4, 2019, Defendants moved to preclude Plaintiffs from seeking punitive damages at the upcoming (but currently unscheduled) jury trial.[76]

---

[71]   Uniform Termination Notice for Securities Industry Registration (ECF No. 276-1, Ex. 46).

[72]   April 2009 statement for SWP's Merrill Lynch accounts (ECF No. 276-1, Ex. 17); *see also* April 22, 2009 email from Brandy Plocinski to Ms. Brubacher (ECF No. 276-1, Ex. 39) ("I received the payoff today for the [line of credit], I am ready whenever you are."); Deposition of Miriam Martin (ECF No. 276-1, Ex. 40) at 75-77.

[73]   October 10, 2017 Memorandum Opinion (ECF No. 220) at 16-17.

[74]   *Id.*

[75]   *Id.*

[76]   ECF No. 272.

## II.    DISCUSSION

Pennsylvania has adopted[77] Section 908 of the Second Restatement of Torts, which states that:

> (1) Punitive damages are damages, other than compensatory or nominal damages, awarded against a person to punish him for his outrageous conduct and to deter him and others like him from similar conduct in the future.
>
> (2) Punitive damages may be awarded for conduct that is outrageous, because of the defendant's evil motive or his reckless indifference to the rights of others.  In assessing punitive damages, the trier of fact can properly consider the character of the defendant's act, the nature and extent of the harm to the plaintiff that the defendant caused or intended to cause[,] and the wealth of the defendant.

Therefore, to seek punitive damages at trial, Plaintiffs must point to evidence from which a jury, "mak[ing] a careful analysis of the entire trial record," could find that Defendants "acted in a fashion which [wa]s particularly egregious."[78]  Such a finding requires evidence that Defendants "had a subjective appreciation of the risk of harm to which [P]laintiff[s] w[ere] exposed" and "acted or failed to act in conscious disregard of that risk."[79]   Based on the evidence identified above, this Court concludes that a rational jury could make such a finding.

As noted, Mr. Bellmore involved himself—and, by extension, Merrill Lynch—intimately in SWP's film financing program.   He had a thorough

---

[77]   *See In re Lemington Home for the Aged*, 777 F.3d 620, 631 (3d Cir. 2015).

[78]   *Id.* at 633.

[79]   *Mifflinburg Telegraph, Inc. v. Criswell*, 277 F.Supp.3d 750, 805-06 (M.D. Pa. 2017).

understanding of what the Jacobses intended to do with producers' money,[80] and shared that understanding with his superiors at Merrill Lynch.[81]  He interacted with the producers directly,[82] kept SWP up-to-date on those interactions,[83] and advised SWP itself on how to interact with the producers on more than one occasion.[84]

From the beginning, Mr. Bellmore was candid about the risk involved in SWP's program.  He admitted—both to SWP and to his superiors at Merrill Lynch— that the scheme raised red-flags on its face,[85] might put producers' deposits at risk,[86] and raised the specter of liability for Merrill Lynch.[87]  In fact, Mr. Bellmore had a

---

[80]  *See* December 26, 2008 email from Mr. Bellmore to Mr. Davis (ECF No. 272-2, Ex. 7) ("[w]hen the producers'] accounts are opened with Merrill, I need to make sure they correspond with the financing agreement, the producers' expectations, and your . . . expectations.").

[81]  *See, e.g.*, January 7, 2009 email from Mr. Bellmore to Ms. Brubacher and Ms. Fought (ECF No. 272-2, Ex. 14) (sharing SWP's "Business Model").

[82]  *See, e.g.*, March 2, 2009 letter from Mr. Bellmore to Trojan Productions (ECF No. 276-1, Ex. 24).

[83]  *See, e.g.*, December 31, 2008 email from Mr. Bellmore to Mr. Davis (ECF No. 272-2, Ex. 12) (notifying Mr. Davis about the arrival of Trojan's deposit at Merrill Lynch).

[84]  *See, e.g.*, *id.* (Mr. Bellmore "suggest[ing]" that, in order for SWP "to obtain the earlier commitment of [other] producer[s]," that "all funds be wired to SWP and then transferred to the [producer's] sub account once [the sub account] is opened"); March 2, 2009 email from Mr. Bellmore to the Jacobses (ECF No. 276-1, Ex. 7) (recommending language the Jacobses could use in dealing with Trojan's inquiries about its deposit).

[85]  *See, e.g.*, December 31, 2008 email from Mr. Bellmore to Mr. Davis (ECF No. 272-2, Ex. 12) (noting that Merrill Lynch was "in compliance review because of the nature and structure of the business").

[86]  *See, e.g.*, Undated email from Mr. Bellmore to Mr. Walton and Ms. Fought (ECF No. 272-2, Ex. 4) (expressing a desire to review the contract to "know whether the [producers'] deposit[s] [were] at risk").

[87]  *See, e.g.*, *id.* (noting he "want[ed] the business, but obviously not the legal problems if there is liability").

concrete warning sign in the form of Trojan's inquiries about its deposit,[88] which deposit had been converted into a CD and left to languish in SWP's account, despite SWP's explicit instructions to the contrary.[89] Nevertheless, Mr. Bellmore persisted, firing off emails to his superiors during the first freeze of SWP's account that stressed the need to get SWP back in business—and, by extension, to get producers' funds rolling into Merrill Lynch.[90]

Of course, one of the producers whose funds he was seeking was Ms. Metcalf. Despite the palace intrigue that caused the freeze, and despite the bud of trouble that had blossomed from the Trojan Productions account, Mr. Bellmore pushed ahead with Ms. Metcalf, communicating with her about the program,[91] facilitating the steps she needed to take to open a Merrill Lynch account,[92] and promising her that her deposit would remain under her control.[93]

---

[88] *See, e.g.*, March 3, 2009 email from Trojan to Mr. Davis, the Jacobses, and Mr. Bellmore (ECF No. 276-1, Ex. 25) (noting that Trojan "ha[d] a lot of issues," including "[n]ot knowing what's going on").

[89] *See* February 11, 2009 fax from the Jacobses to Mr. Bellmore (ECF No. 276-1, Ex. 16) (asking Merrill Lynch to move the $200,000 CD from SWP's account to Trojan's sub account).

[90] *See, e.g.*, March 17, 2009 email from Mr. Bellmore to Ms. Brubacher and Ms. Fought (ECF No. 272-2, Ex. 17) (noting that SWP "ha[s] movies which want to wire in now" and that the freeze could "put [SWP] out of business").

[91] *See* March 17 and 18, 2009 email chain between Ms. Metcalf and Mr. Bellmore (ECF No. 272-2, Ex. 21).

[92] *See* March 16, 2009 email from Mr. Bellmore to Ms. Metcalf (ECF No. 215, Ex. P) (sending Ms. Metcalf an account application).

[93] *See* March 16, 2009 email from Mr. Bellmore to Ms. Hartley, Ms. Metcalf, and the Jacobses (ECF No. 276-1, Ex. 5) ("I setup the sub account for wiring funds directly to it. For the moment, Linda Metcalf is the only signature on the account and will be in control of the funds.").

However, between mid-March 2009 (when Mr. Bellmore promised Ms. Metcalf that she would retain control of her funds) and April 1, 2009 (when Ms. Metcalf's funds arrived at Merrill Lynch) Mr. Bellmore was aware of, and ostensibly helped engineer, a change in SWP's program that prevented producers from having any control over their deposits.[94]  But there is no evidence that Mr. Bellmore took any steps to notify Ms. Metcalf about the change, despite knowing she still intended to deposit her money at SWP's Merrill Lynch account.[95]

The very day Ms. Metcalf's deposit arrived at Merrill Lynch, Trojan's attorney sent a demand letter about Trojan's deposit.  Undeterred by the "feared [that] ha[d] begun," Mr. Bellmore and others at Merrill Lynch continued their efforts to retain Ms. Metcalf's business by helping to open a sub account for her deposit[96]—a sub account that, again, was not in her name, despite earlier promises.

It is true that, at some point, someone at Merrill Lynch had enough sense to pull the plug on the entire SWP venture and to seek outside help, in the form of an

---

[94]  *See* March 25, 2009 email from Mr. Bellmore to Ms. Brubacher (ECF No. 272-2, Ex. 24) (discussing "Solar Wind Productions Revised Procedures" that included requiring SWP to have sole control over the deposited funds); March 30, 2009 email from Mr. Bellmore to Ms. Fought (ECF No. 272-2, Ex. 25) ("Solar Wind Productions has agreed to the following for each film: Open . . . [sub] [a]ccounts in Solar Wind Production Tax ID with separate name for each film.").

[95]  *See* March 30, 2009 email from Mr. Bellmore to Ms. Fought (ECF No. 272-2, Ex. 25) (noting that Ms. Metcalf was "having a bank check issued and [was] bringing [it] to a Merrill branch and depositing it in the Solar Wind account.").

[96]  *See, e.g.*, BIAWCMPF document (ECF No. 276-1, Ex. 30) (showing Mr. Bellmore's initials dated April 6, 2009); April 6, 2009 email from Ms. Fought to Ms. Brubacher (ECF No. 276-1, Ex. 29) (asking Ms. Brubacher to "please review this new account for Solar Wind").

interpleader action, sorting out conflicting claims to the funds in SWP's account—claims that were being made by current Merrill Lynch clients (SWP and Trojan) and individuals who had been directly and personally solicited by Merrill Lynch as potential clients (Ms. Metcalf).  Rather than submit its own creditor claim to the interpleader action, however, Merrill Lynch decided to take its share off the top by paying itself first.

There may be innocent explanations for all that occurred.  Or Ms. Metcalf's loss may be the result of sheer negligence on Defendant's part.  But in light of the story this Court has been able to weave from the existing evidentiary strands, a reasonable jury would be able to find that Defendants were actually aware of the risk created to Ms. Metcalf's funds by its actions; that Defendants acted deliberately in light of that risk; and that Defendants' conduct, considered as a whole, was outrageous.

## III.  CONCLUSION

For those reasons, Defendants' motion to preclude Plaintiffs from seeking punitive damages at trial will be denied.  An appropriate order follows.

BY THE COURT:


*s/ Matthew W. Brann*
Matthew W. Brann
United States District Judge

- 23 -