IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| LINDA METCALF, *et al.*, | No. 4:11-CV-00127 |
| Plaintiffs, | (Chief Judge Brann) |
| v. | |
| MERRILL LYNCH, PIERCE, FENNER & SMITH, INC., *et al.*, | |
| Defendants. | |

**MEMORANDUM OPINION**

**OCTOBER 14, 2021**

## I.  BACKGROUND

This Court has previously discussed the facts of this case at length in two separate Memoranda, one addressing Defendants' motion for summary judgment, and a second addressing Defendants' motion to preclude punitive damages.[1] Thus, from a background perspective, it suffices to state simply that Plaintiffs reached an agreement with a third party, Solar Wind, to obtain financing for a potential film production.[2] Pursuant to that agreement, Linda Metcalf deposited $200,000 with Merrill Lynch, Pierce, Fenner & Smith, Inc. ("Merrill Lynch"), which was to be used to purchase a certificate of deposit ("CD") that would be placed within Solar Wind's Merrill Lynch account, with Metcalf retaining control over that subaccount; Merrill

---

[1]  Docs. 220, 282.
[2]  Doc. 220 at 1-7.

Lynch never purchased a CD with those funds, nor did it deposit those funds in a subaccount controlled by Metcalf but, instead, deposited the funds directly into Solar Wind's account.[3] After significant issues arose with Solar Wind, its Merrill Lynch account was closed and the funds in that account were used to pay sums owed to Merrill Lynch.[4] As a result, Metcalf received only $115,239.34 of the original $200,000 that she deposited with Merrill Lynch.[5]

Consequently, Plaintiffs later filed a complaint—which they twice amended—in which they raise several claims related to that failed film project and deposit with Merrill Lynch.[6] Plaintiffs allege that Defendants fraudulently induced them to deposit funds with Defendants.[7] Plaintiffs believed this deposit would be used to produce and finance films but claim that, instead, their funds went to a racketeering enterprise.[8]

In October 2017, this Court granted in part and denied in part Defendants' partial motion for summary judgment.[9] The Court concluded that Plaintiffs could not establish a Racketeer Influenced Corrupt Organizations Act claim, and therefore granted judgment in favor of Defendants as to that claim.[10] The Court also

---

[3]   *Id.* at 12-14.
[4]   *Id.* at 14-17.
[5]   *Id.* at 17.
[6]   Doc. 122.
[7]   *Id.*
[8]   *Id.*
[9]   Docs. 220, 221.
[10]  Doc. 220 at 20-27.

determined that Plaintiffs could not establish damages in the form of lost profits, and therefore denied Plaintiffs' request for lost profit damages.[11] However, the Court concluded that Plaintiffs could establish damages in the form of lost pre-production expenses, and therefore declined to remove that request from the complaint.[12] Finally, the Court determined that Plaintiffs could establish a fiduciary duty between themselves and Defendants and, thus, denied summary judgment as to Plaintiffs' breach of fiduciary duty claim.[13]

As a result of that and other rulings, there are currently four pending claims in this matter. First, there is a claim for fraud based upon Defendants' alleged intentional misstatements concerning the deposit and associated funding.[14] Second, Plaintiffs have a remaining claim for conversion, in which they allege that they provided Defendants with a $200,000 development deposit that Defendants improperly converted.[15] Third, Plaintiffs raise a claim of civil conspiracy.[16] Finally, Plaintiffs claim a breach of fiduciary duty based upon Defendants' alleged failure to care for the funds that Plaintiffs deposited with Merrill Lynch.[17]

In December 2020, Defendants filed a motion to exclude the expert opinion of Peter Leibundgut—Plaintiffs' expert on the fiduciary duties owed by banks to

---

[11] *Id.* at 28-30.
[12] *Id.* at 30-31.
[13] *Id.* at 31-32.
[14] Doc. 122 ¶¶ 86-91.
[15] *Id.* ¶¶ 92-99.
[16] *Id.* ¶¶ 100-102.
[17] *Id.* ¶¶ 103-108.

their customers—on four grounds.[18] First, Defendants argue that Leibundgut is not qualified to offer an opinion on industry standards or duties of care that are applicable to broker-dealers such as Merrill Lynch because he is an expert in the area of banking.[19] Leibundgut offers opinions related to, among other things, banking regulations and principles, and repeatedly asserts in his expert report that Merrill Lynch is a bank; however, Defendants assert that Merrill Lynch has never been a bank and is registered only as a broker-dealer and investment advisor.[20] Defendants therefore argue that, because Leibundgut does not possess any experience in the broker-dealer industry but, instead, solely possesses experience in the banking industry, he has no expertise in the area in which Merrill Lynch operates and is not qualified to offer any opinion regarding Merrill Lynch's conduct in this matter.[21]

Second, Defendants contend that Leibundgut's opinions are unreliable, as they are based upon standards that are applicable to the banking industry, not the broker-dealer industry.[22] Because he bases his opinion on standards from a different industry, his opinion "[b]y definition . . . cannot be said to be reliable."[23]

---

[18]  Doc. 306.
[19]  *Id.* at 12-18.
[20]  *Id.* at 14-15. Leibundgut has since acknowledged that Merrill Lynch is not a bank. Doc. 321 at 100.
[21]  *Id.* at 15-18.
[22]  *Id.* at 18-20.
[23]  *Id.* at 20.

Third, Defendants assert that Leibundgut's testimony does not fit the subject matter of this dispute.[24] Defendants cite to numerous instances where they contend that Leibundgut's understanding of the facts is incorrect, or where he has disavowed his own opinions.[25] Finally, Defendants assert that Leibundgut has rendered improper legal opinions by opining that Merrill Lynch breached a fiduciary duty owed to Plaintiffs and participated in a fraud that was perpetrated by Solar Wind.[26] Although an expert may testify about business customs and practices, he may not testify as to the legal duties arising therefrom, which is what Defendants argue Leibundgut does in his opinion.[27] Furthermore, Defendants contend that Leibundgut makes numerous assertions as to the state of mind of certain parties, which are inadmissible, as those are ultimate facts that must be determined by a jury.[28]

Plaintiffs respond that Leibundgut's testimony is admissible since this matter has nothing to do with securities law and, at its core, this matter involves only the deposit of funds into a Merrill Lynch account and Defendants' failure to properly care for that deposit.[29] Plaintiffs first contend that Leibundgut's opinion fits this case for several reasons: (1) wholly owned subsidiaries of banks[30] are often regulated by agencies that also regulate the owning banks, including the Federal Deposit

---

[24] *Id.* at 20-23.
[25] *Id.*
[26] *Id.* at 23-27.
[27] *Id.*
[28] *Id.* at 27-28.
[29] Doc. 312.
[30] It is uncontested that Merrill Lynch in a wholly owned subsidiary of Bank of America.

5

Insurance Corporation (FDIC), and broker-dealers must comply with the Bank Secrecy Act; (2) Defendants' own policies and procedures reference the Bank Secrecy Act; (3) in 2017 Defendants were fined by the Securities Exchange Commission (SEC) and the Financial Industry Regulatory Authority (FINRA) for violating the Bank Secrecy Act; and (4) Metcalf was informed that her funds would not be comingled with any other funds and would be used to purchase an FDIC-backed CD.[31] Based on those factors, Plaintiffs contend that Defendants, although broker-dealers, have obligations under banking regulations and guidelines and, accordingly, Leibundgut's opinion fits this case.[32]

Second, Plaintiffs contend that Leibundgut is qualified to offer his opinions, since this matter implicates banking principles and he is an expert in banking.[33] Third, and similarly, Plaintiffs argue that Leibundgut's opinions are reliable because he properly applied his expertise in banking to this case.[34] Finally, Plaintiffs agree that Leibundgut may not—and will not—offer any legal or credibility conclusions at trial, or offer any opinion regarding the state of mind of any individuals or entities, but will instead cabin his testimony to the applicable customs, business practices, and standards.[35]

---

[31] *Id.* at 10-12.
[32] *Id.* at 13.
[33] *Id.* at 13-14.
[34] *Id.* at 14-15.
[35] *Id.* at 15.

In May 2021, this Court conducted a hearing on Defendants' motion and received testimony from Leibundgut with respect to his qualifications to provide expert testimony in this matter.[36] Leibundgut gained a significant amount of experience and expertise in the banking sector, having spent most of his career engaged in financial matters such as the financing asset-based lending, performing due diligence on disclosures for bonds, and analyzing banks' compliance with applicable rules and regulations.[37] Although Leibundgut has a great deal of experience with banking regulations, he acknowledged during the *Daubert* hearing that he has never worked in any capacity in the broker-dealer industry, has never been retained to update, revise, or review policies and procedures for broker-dealers, and has never held himself out as an expert on the broker-dealer industry.[38]

Leibundgut nevertheless asserted at the *Daubert* hearing that he is qualified to offer an opinion as to the propriety of Merrill Lynch's actions because, as a result of certain interagency guidance, broker-dealers are subject to—and governed by—many of the same rules and regulations that govern banks.[39] With respect to such interagency guidance, Leibundgut testified that numerous governmental agencies

---

[36] Leibundgut also discussed in detail his application of the relevant rules, regulations, and practices to Defendants' conduct in this matter. However, as Defendants do not challenge Leibundgut's application of those rules to this case—they instead challenge whether those rules are at all applicable here—the Court will not discuss that portion of Leibundgut's opinion.
[37] Doc. 321 at 9-15.
[38] *Id.* at 114-17.
[39] *Id.* at 15-16.

such as "the FCC, FinCEN,[40] FINRA, the OCC,[41] the Federal Reserve and the FDIC work together to try to integrate the[ir] policies and procedures."[42] Due to concerns among those agencies related to the securities industry, an Interagency Statement[43] was created in 1994 that Leibundgut testified addresses

> how you deal with wholly-owned security subsidiaries and/or affiliates through contract. And they are voluminous. They mandate that those entities comply with all of the bank regulatory framework, including internal oversight and control, Bank Secrecy Act, anti-money laundering, fraud detection, training of the employees, risk management, and the list goes on. They're essentially a mirror of the regulatory framework of the bank. When you have a securities line of business under a bank holding company, it all flows top side.[44]

Leibundgut further emphasized that, despite Merrill Lynch being a broker-dealer, "these OCC and Federal Reserve Regulations, particularly under the interagency guidance promulgated in 1994 . . . clearly make them subject to the OCC Federal Reserve oversight."[45] Those rules compel a "bank[] with a wholly-owned subsidiary to make sure that those policies and procedures are integrated in to the policies and procedures and processes and reporting and record keeping pertaining to the securities group" such as Merrill Lynch.[46]

---

[40] The Financial Crimes Enforcement Network.
[41] The Office of the Comptroller of the Currency.
[42] *Id.* at 15.
[43] This statement is known as the Interagency Statement on Retail Sales of Nondeposit Investment Products. The Court will refer to that statement in this Memorandum simply as the "Interagency Statement" or the "Statement."
[44] *Id.* at 16.
[45] *Id.* at 18.
[46] *Id.* at 19.

Leibundgut iterated that certain policies, including due diligence, know your customer, and anti-money laundering, are not strictly segregated between banks and broker-dealers. Rather, those policies are "holistic" and cannot be "carve[d] . . . up [to] say by no means did these entities operate purely under the SEC" because, although "the SEC does have oversight . . . it's an additional body of law. But it is by no means apples and oranges or distinct . . . as alleged by" Defendants.[47] Rather, Leibundgut testified that the OCC does a great deal of regulation of broker-dealers,[48] and broker-dealers are trained to prevent fraud and money laundering and, thus, have an obligation to perform due diligence on their clients and potential clients.[49] These industry standards, according to Leibundgut, are "broad" and encompass "customs and practices across the financial community, brokerage included"[50] and policies and procedures adopted by banks "filter down [to] the wholly-owned subsidiaries of that bank."[51]

Following the *Daubert* hearing, the parties provided the Court with supplemental briefing.[52] Plaintiffs maintain that Leibundgut is qualified to provide expert testimony because his testimony, together with the documents provided at the hearing adequately demonstrate that broker-dealers are governed by certain banking

---

[47]   *Id.* at 19-20.
[48]   *Id.* at 21-22.
[49]   *Id.* at 34-35.
[50]   *Id.* at 36.
[51]   *Id.* at 41-42.
[52]   Docs. 325, 327.

regulations, and Leibundgut properly applies those regulations and practices to the facts of this case.[53] Defendants in turn continue to assert that Leibundgut is not qualified to opine as to the conduct of a broker-dealer, and that none of the documents to which Leibundgut cites actually apply banking regulations to Merrill Lynch.[54]

The competing arguments from the parties lay bare the central question that this Court must resolve here: is Leibundgut—indisputably an expert in banking regulations—qualified to offer an opinion as to what duties Merrill Lynch—indisputably not a bank but, rather, a broker-dealer—owed to Plaintiffs. For the following reasons, the Court concludes that Plaintiffs have offered a sufficient basis to conclude that Leibundgut is qualified to offer such an opinion and, as such, Defendants' motion to exclude will be granted in part and denied in part.[55]

## II. DISCUSSION

Federal Rules of Evidence 702 and 703 govern the admissibility of expert testimony and set forth certain criteria for admissibility. Expanding upon those Rules, the United States Supreme Court set out the standard for admissibility of

---

[53] Doc. 325 at 9-14.
[54] Doc. 327 at 6-15.
[55] As noted above, Plaintiffs concede that Leibundgut may not offer any legal or credibility conclusions at trial or offer any opinion regarding the state of mind of any individuals or entities. Accordingly, Defendants' motion is granted to the extent that it seeks to exclude any legal or credibility conclusions or any opinion regarding the state of mind of any individuals or entities.

expert testimony in *Daubert v. Merrell Dow Pharm., Inc.*[56] The Court in *Daubert* delegated to district courts a "gatekeeping responsibility" under Rule 702, which requires that courts determine at the outset whether an expert witness may "testify to (1) scientific knowledge that (2) will assist the trier of fact."[57] That gate-keeping function demands an assessment of "whether the reasoning or methodology underlying the testimony is scientifically valid" as well as "whether that reasoning or methodology properly can be applied to the facts in issue."[58] A district court "exercises more control over experts than over lay witnesses," since "[e]xpert evidence can be both powerful and quite misleading because of the difficulty in evaluating it."[59]

Following *Daubert*, the United States Court of Appeals for the Third Circuit cast expert admissibility determinations in light of three basic requirements: (1) qualification; (2) reliability; and (3) fit.[60] The qualification prong demands that the proffered expert possess sufficient "specialized knowledge" to testify as an expert.[61] To satisfy the reliability prong, an expert's opinion "must be based on the 'methods and procedures of science' rather than on 'subjective belief or unsupported speculation.'"[62] The Third Circuit has set forth eight non-exclusive factors that "a

---

[56] 509 U.S. 579 (1993).
[57] *Id.* at 592.
[58] *Id.* at 592-93.
[59] *Id.* at 595 (internal quotation marks omitted).
[60] *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 741-43 (3d Cir. 1994) ("*Paoli II*").
[61] *Id.* at 741.
[62] *Id.* at 742 (quoting *Daubert*, 509 U.S. at 589).

district court should take into account" when deciding the reliability of expert testimony:

> (1) whether a method consists of a testable hypothesis; (2) whether the method has been subject to peer review; (3) the known or potential rate of error; (4) the existence and maintenance of standards controlling the technique's operation; (5) whether the method is generally accepted; (6) the relationship of the technique to methods which have been established to be reliable; (7) the qualifications of the expert witness testifying based on the methodology; and (8) the non-judicial uses to which the method has been put.[63]

With regard to the fit prong, the Third Circuit explained that admissibility "depends . . . on the proffered connection between the scientific research or test result . . . and [the] particular disputed factual issues."[64]

The burden of proof for admissibility of expert testimony falls upon the party that seeks to introduce the evidence.[65] However, as the Third Circuit has emphasized, "[t]he test of admissibility is not whether a particular scientific opinion has the best foundation or whether it is demonstrably correct. Rather, the test is whether the particular opinion is based on valid reasoning and reliable methodology."[66]

> This standard is not intended to be a high one, nor is it to be applied in a manner that requires the plaintiffs to prove their case twice—they do not have to demonstrate to the judge by a preponderance of the evidence that the assessments of their experts are correct, they only have to demonstrate by a preponderance of evidence that their opinions are reliable.[67]

---

[63] *Id.* at 742 n.8.
[64] *Id.* at 743 (internal quotation marks omitted).
[65] *Oddi v. Ford Motor Co.*, 234 F.3d 136, 145 (3d Cir. 2000).
[66] *Id.* (internal quotation marks omitted).
[67] *Id.* (internal quotation marks omitted).

District courts must always be cognizant of the fact that "[t]he analysis of the conclusions themselves is for the trier of fact when the expert is subjected to cross-examination."[68]

Judged by those standards, the Court concludes that Leibundgut is qualified to offer his proposed expert opinion and, therefore, that his opinion is both reliable and fits this case.[69] Specifically, although Leibundgut concedes that he is not an expert in the broker-dealer arena, he provides a sufficient basis to conclude, for the purposes of a *Daubert* motion, that many of the banking rules, regulations, and practices upon which he relies are applicable to broker-dealers.

First, Leibundgut cites to the Interagency Statement. That Statement was introduced due to the increased prevalence of banks "recommending or selling to retail customers nondeposit investment products, such as mutual funds and annuities."[70] The Interagency Statement notes that it generally applies only "when

---

[68] *Id.* (internal quotation marks omitted).

[69] With the exception of minor issues to which Plaintiffs concede, Defendants' challenge to Leibundgut's expert opinion centers exclusively around his expertise in the regulations that are applicable to broker-dealers. Doc. 307 at 12-18. It is Leibundgut's alleged lack of qualifications to offer an opinion as to the activities of a broker-dealer that forms the basis of Defendants' contention that his opinion is unreliable, as Defendants argue that the standards that Leibundgut applies to Defendants' conduct are simply not applicable to broker-dealers. *Id.* at 18-23. Furthermore, Plaintiffs concede that Leibundgut may not offer testimony regarding the issues that Defendants assert do not fit this case. Doc. 312 at 15. As such, the Court will not address the three prongs separately in this Memorandum but, rather, will base its decision on the question of whether Leibundgut is qualified to offer expert testimony as to Defendants' duties and obligations. In any event, it is apparent to the Court that Leibundgut reliably applies the regulations to which he cites to Merrill Lynch's conduct, and that his opinion in that respect would be helpful to the jury.

[70] OFFICE OF THE COMPTROLLER OF THE CURRENCY, COMPTROLLER'S HANDBOOK, RETAIL NONDEPOSIT INVESTMENT PRODUCTS, 122 (2015).

retail recommendations or sales of nondeposit investment products are made by:" (1) "Employees of the depository institution"; (2) "Employees of a third party, which may or may not be affiliated with the institution, occurring on the premises of the institution"; or (3) "Sales resulting from a referral of retail customers by the institution to a third party when the depository institution receives a benefit for the referral."[71] As Defendants emphasize, this may exclude Merrill Lynch from the Interagency Statement.

However, other portions of the Statement are more ambiguous as to its application. For instance, one section the Statement provides that "[i]f a depository institution directly or indirectly, including through a subsidiary or service corporation, engages in activities as described above under which a third party sells or recommends nondeposit investment products, the institution should" undertake a number of steps, including entering into "a written agreement with the third party that is approved by the institution's board of directors" which should "[a]t a minimum . . . [s]pecify that the third party will comply with all applicable laws and regulations, and will act consistently with the provisions of this Statement and, in particular, with the provisions relating to customer disclosures."[72]

Second, and notably, the Comptroller's Handbook on Retail Nondeposit Investment Products ("RNDIP Handbook"), which "generally applies to

---

[71] *Id.* at 122-23.
[72] *Id.* at 124.

recommendations or sales of nondeposit investment products to retail customers that fall within the scope of the" Interagency Statement, clarifies that covered "[r]etail sales include, but are not limited to, recommendations and sales to individuals . . . from a referral of retail customers by a bank to an affiliated broker-dealer."[73]

The RNDIP Handbook further recognizes that "[s]ellers that materially mislead clients or provide inaccurate representations in connection with offers and sales of securities could face potential liability under the antifraud provisions of the federal securities laws and the safety and soundness and consumer protection provisions of federal banking laws."[74] The RNDIP Handbook acknowledges that both securities law and banking laws must be applied to these broker-dealers, as "[m]any banks recommend or sell nondeposit investment products either to retail clients directly or more commonly through arrangements with affiliated or unaffiliated third parties."[75] Thus, the RNDIP Handbook emphasizes that "[a] bank using third parties for its RNDIP sales program should implement effective risk management to safeguard its clients as well as the bank itself. The use of affiliated or unaffiliated parties does not relieve the bank from responsibility to take reasonable actions to ensure the third parties' activities meet regulatory requirements."[76]

---

[73] *Id.* at 2-3.
[74] *Id.* at 2.
[75] *Id.* at 1.
[76] *Id.* at 2.

15

The RNDIP Handbook further explains that the Dodd-Frank Act of 2010 removed restrictions on the OCC's ability to regulate bank subsidiaries, including "SEC-registered securities broker-dealers" and the OCC may now "examine, require reports from, and take other actions with respect to a functionally regulated subsidiary."[77] The OCC also has "broad authority to examine banks and their affiliates" and may require reports and take direct or indirect action against those subsidiaries, including broker-dealers, "if the OCC determines that the subsidiary is operating in violation of laws, regulations, or written conditions, or in an unsafe or unsound manner, or otherwise threatens the safety and soundness of the bank."[78]

Given these statements, it is not at all clear, as Defendants assert, that there is *no* authority to support Leibundgut's position that certain banking rules and regulations apply to broker-dealers that are wholly owned subsidiaries of banks. Rather, some of the language contained in the OCC Handbooks indicates that certain safety and soundness rules and regulations do apply to wholly owned subsidiaries such as Merrill Lynch.

Certainly, as Merrill Lynch notes, the OCC Handbooks may not apply to wholly owned broker-dealer subsidiaries in every situation and may not apply to Merrill Lynch in this case.[79] However, it is equally true that the OCC Handbooks may apply to Merrill Lynch because, for example, Bank of America employees refer

---

[77] *Id.* at 12.
[78] *Id.* at 12-13.
[79] *See* Doc. 327 at 11-14.

retail customers to Merrill Lynch for brokerage services, which would place Merrill Lynch within the ambit of the RNDIP Handbook.[80]

Importantly, this Court is only permitted to make a "preliminary assessment" of Leibundgut's testimony, and to determine whether such testimony is "helpful[] to the trier of fact."[81] As the United States Court of Appeals for the Eighth Circuit has explained:

> As a general rule, the factual basis of an expert opinion goes to the credibility of the testimony, not the admissibility, and it is up to the opposing party to examine the factual basis for the opinion in cross-examination. Only if the expert's opinion is so fundamentally unsupported that it can offer no assistance to the jury must such testimony be excluded.[82]

Information indicating that banking rules and regulations may not apply to Merrill Lynch in all circumstances does not render Leibundgut's expert opinion "so fundamentally unsupported that it can offer no assistance to the jury."[83] Rather, Leibundgut testified that such rules and regulations do apply to Merrill Lynch, and the materials to which he cites provide some support for that assertion. Accordingly, it is not within the province of the Court to determine at this stage whether Leibundgut is the "best qualified" expert or whether his opinion is the "most

---

[80] RNDIP Handbook at 2-3. Moreover, it is uncontested that the OCC Handbooks apply to broker-dealers in at least some circumstances. *See* Doc. 327 at 11. Thus, broker-dealers must be familiar with the OCC Handbooks and be prepared to apply them in their course of business.
[81] *United States v. Velasquez*, 64 F.3d 844, 849-50 (3d Cir. 1995) (internal quotation marks omitted).
[82] *First Union Nat. Bank v. Benham*, 423 F.3d 855, 862 (8th Cir. 2005).
[83] *Id.*

appropriate."[84] There is a sufficient basis for his opinion to go to the jury, and the Court will therefore leave any determination as to the relative strength of Leibundgut's opinion to the fact finder in this case.

## III.   CONCLUSION

For the foregoing reasons, the Court concludes that Leibundgut's expert testimony is mostly admissible. Accordingly, Defendants' motion to exclude will be granted in part and denied in part.

An appropriate Order follows.

BY THE COURT:

*s/ Matthew W. Brann*
Matthew W. Brann
Chief United States District Judge

---

[84]   *Holbrook v. Lykes Bros. S.S. Co., Inc.*, 80 F.3d 777, 782 (3d Cir. 1996).