IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

LINDA METCALF, *et al.*,

        Plaintiffs,

    v.

MERRILL LYNCH, PIERCE,
FENNER & SMITH, INC., *et al.*,

        Defendants.

No. 4:11-CV-00127

(Chief Judge Brann)

## MEMORANDUM OPINION

### APRIL 21, 2022

## I.   BACKGROUND

This Court has thoroughly reviewed the facts of this case in two prior Memoranda, one addressing Defendants' motion for summary judgment, and a second addressing Defendants' motion to preclude punitive damages, and will not do so again here.[1] From a background perspective, it suffices to state simply that Plaintiffs reached an agreement with a third party, Solar Wind, to obtain financing for a potential film production.[2] Pursuant to that agreement, Linda Metcalf deposited $200,000 with Merrill Lynch, Pierce, Fenner & Smith, Inc. ("Merrill Lynch"), which was to be used to purchase a certificate of deposit ("CD") that would be placed within Solar Wind's Merrill Lynch account, with Metcalf retaining control over that

---

[1]   Docs. 220, 282.
[2]   Doc. 220 at 1-7.

subaccount; Merrill Lynch never purchased a CD with those funds, nor did it deposit those funds in a subaccount controlled by Metcalf but, instead, deposited the funds directly into Solar Wind's account.[3] After significant issues arose with Solar Wind, its Merrill Lynch account was closed and the funds in that account were used to pay sums owed to Merrill Lynch.[4] As a result, Metcalf received only $115,239.34 of the original $200,000 that she deposited with Merrill Lynch.[5] Moreover, Plaintiffs assert that they incurred $372,872 in preproduction expenses that they allegedly lost as a result of Defendants' actions.[6]

Consequently, Plaintiffs filed a complaint in 2011—which they twice amended—in which they raise several claims related to that failed film project and deposit with Merrill Lynch, as well as the lost preproduction expenses.[7] Plaintiffs allege that Defendants fraudulently induced them to deposit funds with Defendants.[8] Plaintiffs believed this deposit would be used to produce and finance films but claim that, instead, their funds went to a racketeering enterprise.[9]

In October 2017, this Court granted in part and denied in part Defendants' partial motion for summary judgment.[10] The Court concluded that Plaintiffs could

---

[3]   *Id.* at 12-14.
[4]   *Id.* at 14-17.
[5]   *Id.* at 17.
[6]   Doc. 122 ¶ 68-70; Doc. 335 at 5-10.
[7]   Doc. 122.
[8]   *Id.*
[9]   *Id.*
[10]  Docs. 220, 221.

not establish a Racketeer Influenced Corrupt Organizations Act claim, and therefore granted judgment in favor of Defendants as to that claim.[11] The Court also determined that Plaintiffs could not establish damages in the form of lost profits, and therefore denied Plaintiffs' request for lost profit damages.[12]

The Court concluded, however, that Plaintiffs could potentially establish damages in the form of lost preproduction expenses, but only to the extent that Plaintiffs "expended money to produce their film in reliance on promises of further funding for that film," and therefore declined to remove that request from the complaint.[13] Finally, this Court determined that Plaintiffs could establish a fiduciary duty between themselves and Defendants and, consequently, denied summary judgment as to Plaintiffs' breach of fiduciary duty claim.[14]

As a result of that and other rulings, there are currently four pending claims in this matter. First, there is a claim for fraud based upon Defendants' alleged intentional misstatements concerning the deposit and associated funding.[15] Second, Plaintiffs have a remaining claim for conversion, in which they allege that they provided Defendants with a $200,000 development deposit that Defendants improperly converted.[16] Third, Plaintiffs raise a claim of civil conspiracy.[17] Finally,

---

[11] Doc. 220 at 20-27.
[12] *Id.* at 28-30.
[13] *Id.* at 30-31.
[14] *Id.* at 31-32.
[15] Doc. 122 ¶¶ 86-91.
[16] *Id.* ¶¶ 92-99.
[17] *Id.* ¶¶ 100-102.

Plaintiffs claim a breach of fiduciary duty based upon Defendants' alleged failure to care for the funds that Plaintiffs deposited with Merrill Lynch.[18]

In February 2022, the parties filed separate motions *in limine*.[19] Defendants seek to exclude any evidence related to Plaintiffs' preproduction expenses, as they argue that none of those expenses—all of which predate any involvement of Merrill Lynch—were made in reliance on any statements made by Defendants.[20] Plaintiffs in turn seek to exclude any evidence that Defendants relied on the advice of counsel in taking certain actions, as Defendants did not assert reliance on the advice of counsel as an affirmative defense, and Plaintiffs did not conduct discovery on this issue because they relied on defense counsel's assertion that Defendants would not pursue such a defense.[21]

The parties have filed response and reply briefs, and the motions are ripe for disposition.[22] Upon consideration of the briefs and evidence, as discussed below, Defendants' motion *in limine* will be conditionally granted, while Plaintiffs' motion *in limine* will be granted in part and denied in part.

---

[18] *Id.* ¶¶ 103-108.
[19] Docs. 333, 334.
[20] Doc. 335.
[21] Doc. 336.
[22] Docs. 337-340.

## II.   DISCUSSION

Courts exercise discretion to rule *in limine* on evidentiary issues "in appropriate cases."[23] While motions *in limine* may serve as a useful pretrial tool that enables more in-depth briefing than would be available at trial, a court may defer ruling on such motions "if the context of trial would provide clarity."[24] "[M]otions *in limine* often present issues for which final decision is best reserved for a specific trial situation."[25] Thus, certain motions, "especially ones that encompass broad classes of evidence, should generally be deferred until trial to allow for the resolution of questions of foundation, relevancy, and potential prejudice in proper context."[26] Specifically, "*pretrial* Rule 403 exclusions should rarely be granted . . . [as] a court cannot fairly ascertain the potential relevance of evidence for Rule 403 purposes until it has a full record relevant to the putatively objectionable evidence."[27] Regardless, "*in limine* rulings are not binding on the trial judge, and the judge may always change his mind during the course of a trial."[28]

---

[23]  *In re Japanese Elec. Prods. Antitrust Litig.*, 723 F.2d 238, 260 (3d Cir. 1983), *rev'd on other grounds sub nom. Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986).
[24]  *Frintner v. TruePosition*, 892 F. Supp. 2d 699, 707 (E.D. Pa. 2012).
[25]  *Walden v. Georgia-Pacific Corp.*, 126 F.3d 506, 518 n.10 (3d Cir. 1997).
[26]  *Leonard v. Stemetech Health Scis., Inc.*, 981 F. Supp. 2d 273, 276 (D. Del. 2013).
[27]  *In re Paoli R.R. Yard PCB Litig.*, 916 F.2d 829, 859 (3d Cir. 1990).
[28]  *Ohler v. United States*, 529 U.S. 753, 758 n.3 (2000).

### A.   Defendants' Motion to Preclude Evidence of Preproduction Expenses

First, Defendants seek to preclude Plaintiffs from introducing at trial any evidence related preproduction expenses.[29] Defendants assert that all of Plaintiffs' preproduction expenses arose in 2008 or early 2009 before Merrill Lynch had any involvement with Plaintiffs and, therefore, Plaintiffs could not have justifiably relied upon any representations from Merrill Lynch in incurring those expenses.[30] Plaintiffs respond that Defendants' actions are the proximate cause of the lost preproduction expenses, and Plaintiffs may therefore properly introduce evidence of such damages.[31]

Contrary to Plaintiffs' argument, in ruling on Defendants' motion for summary judgment, this Court was clear that "[u]nder Pennsylvania law, '[t]he victim of a misrepresentation is entitled to all pecuniary losses which result from his *reliance* on the misrepresentations.'"[32] This Court permitted Plaintiffs to seek preproduction expenses, but was clear in cabining any attempt to recover such expenses only to what Plaintiffs "spent in the past, in reliance on defendant's wrongful actions."[33]

---

[29]  Doc. 334.
[30]  Doc. 335.
[31]  Doc. 338.
[32]  Doc. 220 at 30 (quoting *Fort Washington Resources, Inc. v. Tannen*, 858 F. Supp. 455, 461 (E.D. Pa. 1994)).
[33]  *Id.* at 31.

This ruling was based on the uncontroversial notion that, in Pennsylvania, "the successful maintenance of a cause of action for fraud includes, *inter alia,* a showing that the plaintiff acted in reliance on the defendant's misrepresentations."[34] The United States Court of Appeals for the Third Circuit has further explained that:

> As developed in Pennsylvania common law, a fraud claim consists of six elements: (1) . . . A misrepresentation . . .; (2) Which is material to the transaction at hand; (3) . . . Made with knowledge of its falsity or recklessness as to whether it is true or false . . .; (4) With the intent of misleading another into relying on it; (5) Justifiable reliance on the misrepresentation; and (6) A resulting injury proximately caused by such reliance.[35]

As this standard makes clear, it is beyond peradventure that, under Pennsylvania law, a "fraud claim *requires* a plaintiff to prove actual reliance."[36] For that reason, while "[r]eliance damages include expenditures made in preparation for performance or in performance, . . . expenses [that] were not made in reliance on any promise of the defendant" are not recoverable.[37] This rule ensures that plaintiffs will be put in the same position they would have been in if not for the misrepresentations,

---

[34] *Liss & Marion, P.C. v. Recordex Acquisition Corp.*, 983 A.2d 652, 665 (Pa. 2009) (brackets and internal quotation marks omitted).

[35] *SodexoMAGIC, LLC v. Drexel Univ.*, 24 F.4th 183, 205 (3d Cir. 2022) (citing *Gibbs v. Ernst*, 647 A.2d 882, 889 & n.12 (Pa. 1994)).

[36] *Santana Prod., Inc. v. Bobrick Washroom Equip., Inc.*, 401 F.3d 123, 137 (3d Cir. 2005).

[37] *Drysdale v. Woerth*, 153 F. Supp. 2d 678, 683 (E.D. Pa. 2001) (quoting 22 Am.Jur.2d *Damages*, § 594 (1988)). *See also Gidley v. Allstate Ins. Co.*, No. CIV.A. 09-3701, 2009 WL 3199599, at *3 (E.D. Pa. Oct. 6, 2009) (dismissing claim based on fraudulent misrepresentations because "all of plaintiffs' treatments occurred prior to the issuance of the peer review reports, plaintiffs [therefore] could not have relied on the reports' contents when making their treatment decisions"); *Gill v. Kaur*, No. CV 21-0999, 2021 WL 5631741, at *6 (E.D. Pa. Nov. 30, 2021) (granting judgment in favor of defendant on fraud claim where plaintiff did not see allegedly forged note and therefore could not have relied on it).

since such "expenditures would have been spent regardless of the" alleged misrepresentations.[38]

Here, Plaintiffs do not contest that, from October 2008 to March 2009, they had no success in obtaining financing or signing financing agreements.[39] It was not until January 8, 2009, that Plaintiffs received a packet from Solar Wind to begin the process of obtaining financing from that company.[40] On January 27, 2009, Plaintiffs received a number of documents, including one that contained instructions on how to open a Merrill Lynch subaccount and instructed Plaintiffs to deposit funds in that account once they entered into an agreement with Solar Wind.[41] Plaintiffs thereafter negotiated the terms of a financing agreement with Solar Wind, which was executed on March 12, 2009.[42] Although Merrill Lynch was not a party to that agreement, the financing agreement did require that Plaintiffs provide a deposit "to [Solar Wind's] Selected Brokerage Firm, or Merrill Lynch . . . within three (3) business days" of execution of the financial agreement.[43]

Prior to entering into the financing agreement, Plaintiffs expended $372,872 in preproduction expenses in preparation for the film.[44] Those sums included

---

[38] *Drysdale*, 153 F. Supp. 2d at 683.
[39] Doc. 213-3 ¶ 8.
[40] *Id.* ¶¶ 9-10.
[41] *Id.* ¶¶ 11-13; Doc. 215-3 at 58-81.
[42] Doc. 213 ¶¶ 14-16; Doc. 215-4 at 7-29.
[43] Doc. 215-4 at 8.
[44] Doc. 122 ¶ 68; Doc. 213 ¶ 32; Doc. 334-3 at 2.

$10,000 paid to Scott Rosenfelt at some unidentified time in 2008[45] to assist in the development of the movie; the agreement was entered into on November 24, 2008, with a commencement date of December 1, 2008.[46] Plaintiffs also allegedly paid $3,500 to Ashley Freidman to prepare budgets and schedules; Plaintiffs were invoiced for this work on December 8, 2008, and paid Freidman at some point in 2008.[47] Plaintiffs further paid $17,500 to James Bills, a graphic artist, in November 2008.[48]

Plaintiffs also paid $25,000 to David Hughes for unknown work, with these payments occurring in October and November 2008.[49] In October 2008, Plaintiffs allegedly made a $1,500 payment to Robert Moline and/or Suntrust, although the purpose of this payment has not been explained.[50] Plaintiffs further assert that they made a $287,000 payment to Sovereign Bank Finance and/or Swedish Commerce Savings & Loan and, although the specifics of that payment are unclear, the loan documents provided in discovery state that the loan provided to Plaintiffs "may be drawn down in the third calendar quarter of 2008,"[51] and a SWIFT notification was sent on behalf of Swedish Commerce Savings & Loan to Plaintiffs on November 8,

---

[45]   Doc. 334-3 at 2, 27.
[46]   *Id.* at 16-25.
[47]   *Id.* at 27, 30. Although Plaintiffs assert that $3,500 was paid to Freidman, *id.* at 2, the invoice and QuickBooks report note only $1,500 paid.
[48]   *Id.* at 2, 33.
[49]   *Id.* at 2, 33, 36. While Plaintiffs allege that they paid Hughes $25,000, the available documentation only supports expenditures of $22,200.
[50]   *Id.* at 2.
[51]   *Id.* at 40.

2008.[52] Plaintiffs contend that they expended $6,372 on travel and meetings, although they provide no evidence to support whether or when these expenses occurred.[53] Finally, Plaintiffs paid $22,000 to producer Rob Rappaport on March 9, 2009, in furtherance of an agreement with him that was executed thereafter on March 18, 2009.[54]

Almost all of the identified preproduction expenses occurred before Plaintiffs entered into the financing agreement with Solar Wind that provided Plaintiffs would deposit money into a Merrill Lynch account. Indeed, most of these expenses were incurred before Plaintiffs even began negotiating with Solar Wind in January 2009. It is clear then that those expenses, totaling $344,500,[55] may not be recovered in this action, as it is not possible that Plaintiffs made those expenditures—all of which were incurred in or before early December 2008—in reliance on any misrepresentations made by Defendants, since no representations whatsoever had yet been made by Defendants to Plaintiffs.

Two identified expenses could arguably have occurred in reliance on Defendants' alleged misrepresentations—those being $6,372 in travel and meeting expenses, and a $22,000 payment to Rob Rappaport. The agreement with Rob

---

[52] *Id.* at 41.

[53] *Id.* at 2.

[54] *Id.* at 44, 46-54.

[55] That sum includes $10,000 paid to Scott Rosenfelt, $3,500 to Ashley Freidman, $17,500 to James Bills, $25,000 to David Hughes, a $1,500 payment to Robert Moline, and $287,000 paid to Sovereign Bank Finance and/or Swedish Commerce Savings & Loan.

Rappaport was executed on March 18, 2009, after Plaintiffs signed the financing agreement with Solar Wind, while the payment was made to Rappaport on March 9, 2009—prior to the execution of the financing agreement, but during the period of negotiations between Plaintiffs and Solar Wind. Although it is conceivable that Plaintiffs could establish that these expenses were made in reliance on representations from Defendants, Plaintiffs not only have failed to provide evidence that they acted in reliance of any of Defendants' representations, they do not even *argue* that those expenses were made in reliance on Defendants alleged misrepresentations.[56] Absent any indication that Plaintiffs incurred these preproduction expenses in reliance on Defendants' representations, Plaintiffs will not be permitted to introduce evidence of these expenses at trial.

Accordingly, Defendants' motion *in limine* to preclude the admission of evidence related to preproduction expenses is conditionally granted. The Court may revisit this determination at the time of trial upon appropriate motion, should Plaintiffs produce evidence that Defendants made material representations to Plaintiffs prior to the date of these preproduction expenditures, and that Plaintiffs made such expenditures in reliance on those representations.

---

[56] *See* Doc. 338.

**B.** **Plaintiffs Motion to Preclude Evidence of Reliance on Advice of Counsel**

Finally, Plaintiffs seek to preclude any evidence that Defendants relied on the advice of counsel in taking the actions that form the basis of this matter.[57] Specifically, Plaintiffs assert that defense counsel affirmatively represented that Defendants would not rely on an advice-of-counsel-defense and, in reliance on that statement, Plaintiffs did not pursue discovery related to the advice provided by Defendants' attorneys.[58] Plaintiffs contend that, because they failed to seek discovery on this matter, they would be prejudiced should Defendants be permitted to introduce such evidence at trial.[59]

Defendants in turn argue that they should be permitted to introduce such evidence, since Plaintiffs seek punitive damages based on the allegation that Defendants' conduct was outrageous due to their evil motive or reckless indifference to the rights of others, and Defendants' actions in seeking the advice of counsel are relevant to that inquiry and to whether Defendants acted in good faith.[60] Because Plaintiffs' effort to seek punitive damages does not implicate a cause of action, Defendants assert that they did not need to plead an affirmative defense, nor will they seek to invoke an actual advice-of-counsel-defense.[61] Finally, Defendants argue

---

[57] Doc. 333.
[58] Doc. 336 at 7-8.
[59] *Id.* at 9.
[60] Doc. 337 at 6-7.
[61] *Id.* at 6-9.

that Plaintiffs' had a full and fair opportunity to explore this issue in discovery, and therefore Plaintiffs would not be prejudiced by the introduction of this evidence.[62]

Plaintiffs' motion relies on Federal Rule of Civil Procedure 8(c), which provides that "[i]n responding to a pleading, a party must affirmatively state any avoidance or affirmative defense." It is well established that "[a]n affirmative defense which is neither pleaded as required by Rule 8(c) nor made the subject of an appropriate motion under Rule 12(b) is waived."[63] Despite this general waiver rule, the Third Circuit has held that "affirmative defenses may be raised at any time, even after trial, so long as the plaintiff suffers no prejudice."[64]

Although the advice-of-counsel defense may be an affirmative defense that must be pled in an answer or raised in a 12(b) motion,[65] here Defendants assert that they will not raise any such affirmative defense at trial; rather, they will raise the issue of the advice of their attorneys as a defense against punitive damages.[66] The Supreme Court of Pennsylvania has held that "no independent action exists for a claim of punitive damage since punitive damages is only an *element* of damages" that "aris[e] out of the initial cause of action."[67] Numerous courts have therefore

---

[62] *Id.* at 9-12.

[63] *Moody v. Atl. City Bd. of Educ.*, 870 F.3d 206, 218 (3d Cir. 2017) (brackets and internal quotation marks omitted).

[64] *Clews v. County of Schuylkill*, 12 F.4th 353, 358 (3d Cir. 2021).

[65] *Cf. Glenmede Tr. Co. v. Thompson*, 56 F.3d 476, 486 (3d Cir. 1995) (noting that defendants may raise "reliance on the advice of counsel as an affirmative defense").

[66] Doc. 337 at 7-9.

[67] *Kirkbride v. Lisbon Contractors, Inc.*, 555 A.2d 800, 802 (Pa. 1989).

concluded that a defense to a request for punitive damages is not an affirmative defense, and therefore need not be pled in an answer or raised in a motion to dismiss.[68] Accordingly, to the extent that Defendants raise their conversations with counsel only as a defense against the imposition of punitive damages, the Court concludes that they were not required to affirmatively plead such a defense, and the failure to so plead is not a proper ground to exclude evidence related to Defendants' communications with their attorneys.

As to whether Defendants may present an advice-of-counsel-defense at trial, Defendants have represented both to Plaintiffs' counsel and to the Court that they will not raise such a defense to justify the substance or legality of their actions.[69] Based upon these representations, Plaintiffs' motion *in limine* will be granted in part, to the extent that Defendants will be prohibited from asserting that they followed the advice of counsel as a defense to the allegations against them. In sum, Plaintiffs'

---

[68] *Cf. Davis v. Holifield*, No. CA 21-0044-CG-MU, 2021 WL 6137309, at *7 (S.D. Ala. Dec. 9, 2021) (holding that, because "punitive damages are not a separate cause of action but part of a plaintiff's prayer," an affirmative defense may not be raised in response to such a request), *report and recommendation adopted*, No. CA 21-0044-CG-MU, 2021 WL 6134692 (S.D. Ala. Dec. 29, 2021); *Tarasewicz v. Royal Caribbean Cruises Ltd.*, No. 14-CIV-60885, 2015 WL 1566398, at *2 (S.D. Fla. Apr. 8, 2015) (concluding that "punitive damages are not a separate cause of action but part of a plaintiff's prayer for relief, and as such, cannot separately support affirmative defenses"); *EEOC v. United Galaxy, Inc.*, No. 2:10-CV-4987, 2011 WL 1042769, at *3 (D.N.J. Mar. 17, 2011) (holding that "arguments and evidence [against a request for punitive damages] go to whether Plaintiff has carried its burden in establishing that it is entitled to punitive damages and are not properly asserted as an affirmative defense").

[69] *See* Doc. 333-2 at 5 (counsel for Defendants stating in response to question from Plaintiffs' counsel that "Merrill Lynch is not raising a reliance on counsel defense"); Doc. 337 at 8 ("The Merrill Lynch Defendants are not raising an advice of counsel defense to demonstrate the 'legality' of their actions").

motion *in limine* is granted in part and denied in part; Defendants may reference their communications with counsel as a defense against the imposition of punitive damages, but may not reference such communications as a defense against their liability in this matter. To avoid any issues of confusion with the jury, upon motion from Plaintiffs, the Court will issue an appropriate limiting instruction to the jury.

## III.   CONCLUSION

In accordance with the above discussion, Defendants' motion *in limine* will be conditionally granted, while Plaintiffs' motion *in limine* will be granted in part and denied in part.

An appropriate Order follows.

BY THE COURT:

*s/ Matthew W. Brann*
Matthew W. Brann
Chief United States District Judge